[L.A. No. 29919. In Bank. Sept. 6, 1972.]

CITY OF INGLEWOOD-LOS ANGELES COUNTY
CIVIC CENTER AUTHORITY et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
ARGO CONSTRUCTION CO., INC., et al., Real Parties in Interest.

**862**

## COUNSEL

Donald E. Olson, City Attorney, R. Wicks Stephens II, Stephens, Jones, La Fever & Smith and Hassard, Bonnington, Rogers & Huber for Petitioners.

Martin & Flandrick and Stephen H. Galton as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Paul M. Hittelman, Everett W. Maguire and Shapiro & Maguire for Real Parties in Interest.

## OPINION

**MOSK, J.**—Petitioners seek mandate to compel respondent superior court to annul its judgment and a peremptory writ of mandate issued thereon, or, in the alternative, prohibition to prevent the enforcement of its judg-

ment. The respondent court's judgment restrained petitioner City of Inglewood-Los Angeles County Civic Center Authority (Authority) from executing or performing a contract awarded to Swinerton & Walberg Co. (Swinerton) relating to the construction of a civic center project. The mandate proceeding in respondent court was instituted by real party in interest, Argo Construction Co., Inc. (Argo), to have the contract award annulled and set aside.

Section 25454 of the Government Code[1] provides that a contract for a "construction project" exceeding $6,500 must be awarded to the "lowest responsible bidder." Argo was the lowest bidder and it claims that the contract was improperly issued to Swinerton. The primary issues involved in this proceeding are (1) whether the section is applicable to the type of contract awarded here; (2) whether, if so, the Authority applied the appropriate standard in determining that Swinerton was the lowest responsible bidder, and (3) whether a contractor who has submitted the lowest monetary bid is entitled to a full judicial hearing to determine if he is responsible. The trial court found in Argo's favor, and it issued a writ of mandate ordering petitioners to refrain from executing or performing the contract awarded to Swinerton unless a hearing is held "of the type described in the Administrative Procedure Act" to evaluate Argo's responsibility and a contract awarded in accordance with the result of such hearing or, in the alternative, to refrain from paying out any funds for the construction work until the project is again opened for competitive bidding.

Petitioner Authority was constituted pursuant to a "joint exercise of powers agreement" entered into in February 1970 by the City of Inglewood and the County of Los Angeles, as authorized by section 6500 et seq. The Authority is a separate and distinct public entity (§ 6507). It was established to construct the City of Inglewood-Los Angeles County Civic Center, which was planned to include both city and county buildings. The governing board of the Authority is the five-member Civic Center Authority Commission. As directed by section 6503, the joint agreement creating the Authority provides "for the method by which the purpose [of the Authority] will be accomplished or the manner in which [its] power will be exercised."[2]

---

[1] All section references are to the Government Code unless otherwise indicated.

[2] Section 4 of the joint agreement states in pertinent part that "The Authority shall have the powers common to City and County set forth in Section 1 of this Agreement, to wit: acquiring, constructing, maintaining . . . public buildings . . . . The Authority is hereby authorized . . . to do all acts necessary for the exercise of said common power for said purpose, including . . . any or all of the following: to make and enter into contracts, to employ agents and employees, to acquire, construct,

Charles Luckman Associates (Luckman) was retained by the Authority as architects, and prepared preliminary plans for the civic center buildings, a $12,000,000 project. Luckman recommended that the Authority proceed with the construction of the project by means of a management contract. The operation of the management contracting method was summarized by Luckman as follows:

"Under the traditional lump sum method of bidding, contractors enter the project process upon the completion of working drawings. At this point in time they have little opportunity or incentive to contribute to cost reduction.

"The Management Contracting Method . . . differs from this traditional lump sum method in that the contractor is brought into the building project through competitive bidding at or shortly after, the completion of preliminary plans, rather than working drawings. He is then called upon to contribute his practical expertise during the development of the working drawings, and subsequently apply this expertise during construction, in order to achieve maximum economies. He is expected to provide cost estimates from time to time during development of working drawings to determine that the project is within budget so that some of the early phases of construction can proceed prior to completion of all of the drawings. This makes it possible to save a significant amount of time in the total building process." The management contractor performs none of the construction itself unless he is awarded a separate contract therefor as the lowest responsible bidder in subsequent bidding under the traditional "lump sum" bidding procedures.[3]

---

manage, maintain and operate any buildings, works or improvements . . . . Such powers shall be exercised in the manner provided in the Act and, except as expressly set forth herein, subject only to such restrictions upon the manner of exercising such powers as are imposed upon the County in the exercise of similar powers. . . ."

Section 10 of the agreement relates to the design and construction of city facilities . only. It provides, inter alia, that "Upon approval of the final plans and specifications for the City Project by City, Authority shall call for competitive bids to let necessary construction contracts for the City Project. Authority shall award such construction contracts to the lowest responsible bidders after the approval of said bidders by City. The City Project shall then be constructed by the lowest responsible bidders in accordance with the plans and specifications approved by City . . . .

". . . . Pursuant to Section 4 hereof, all powers of Authority and City . . . related to construction shall be exercised in the manner provided in this Agreement. . . ."

[3] When the construction documents near completion and as competitive subcontract bids are received, the management contractor converts his previous cost estimates into a guaranteed outside price (GOP) based on the subcontract bids. If the final construction cost, including the management contractor's fees, "exceeds the GOP, the City of Inglewood makes payment only up to the amount of the GOP. If the final cost is less than the GOP, the difference is shared by the City . . . and

The management contracting procedure was approved by the Inglewood City Council, and Swinerton was awarded the contract after various proceedings which will be described in detail *infra*.

I

Petitioners urge that the management contract here at issue was basically a contract for services as a consultant and supervisor-manager rather than a contract for a "construction project" and thus did not fall within the competitive bidding requirements upon which Argo relies. Those requirements are found in the Government Code and in the charter of the City of Inglewood[4] as well as in the joint exercise of powers agreement. They provide that public construction of the magnitude here involved shall be accomplished by contract let to the lowest responsible bidder.

It is true that the management contractor was to perform services and to lend his experience and expertise in the preparation of the final plans, and in that respect may be likened to an engineer or an architect whose services may be procured without strict compliance with competitive bidding requirements. (See *Kennedy* v. *Ross* (1946) 28 Cal.2d 569, 581-582 [170 P.2d 904]; *San Francisco* v. *Boyd* (1941) 17 Cal.2d 606, 620 [110 P.2d 1036]; *Cobb* v. *Pasadena City Bd. of Education* (1955) 134 Cal.App.2d 93, 95 [285 P.2d 41].) However, our review of the other duties and obligations which were required of the management contractor in this case, including his guarantee of the outside price based on the subcontract bids, persuades us that the management contracting procedure as proposed and followed here is too closely akin to traditional lump sum general construction contracting to be held exempt from the statutory competitive bidding requirements. To hold otherwise as a broad principle would open the door to possible favoritism, fraud or corruption in the letting of other public construction contracts.

---

the [management] contractor in the proportion specified in the [latter's] original bid under 'Shared Savings.'"

[4]Sections 25450 and 25450.4 provide with respect to counties that when a construction project such as here involved exceeds $6,500 in cost "the work shall be done by contract." Any such contract not let pursuant to those sections is void. Section 25452 requires that "an advertisement for bids for the performance of the work" be published or posted. Section 25454 directs that the board of supervisors "shall award the contract to the lowest responsible bidder . . . [who] shall perform the work in accordance with the plans, specifications, strain sheets, and working details . . . ." Government Code provisions relating to cities contain similar requirements. (§§ 37901, 37902.)

The Inglewood City Charter (in art. XXXIII, § 1) provides that a contract for the construction of a public building costing more than $2,000 shall be let to the lowest responsible bidder.

## II

■ The next issue is whether petitioners applied the proper standards in determining that Swinerton was the lowest responsible bidder, as that term is used in section 25454. ■ It bears emphasis that the word "responsible" in the context of the statute is not necessarily employed in the sense of a bidder who is trustworthy so that a finding of nonresponsibility connotes untrustworthiness. Rather, while that term includes the attribute of trustworthiness, it also has reference to the quality, fitness and capacity of the low bidder to satisfactorily perform the proposed work. (See *West* v. *Oakland* (1916) 30 Cal.App. 556, 560 [159 P. 202].) Thus, a contract must be awarded to the lowest bidder unless it is found that he is not responsible, i.e., not qualified to do the particular work under consideration. Whether or not an express finding of nonresponsibility is required (see *Raymond* v. *Fresno City Unified Sch. Dist.* (1954) 123 Cal.App.2d 626, 629-630 [267 P.2d 69]), if a contract is awarded to one other than the lowest monetary bidder, the ineluctable implication is that the latter is not responsible.

■ The parties are in agreement that factors such as those set forth above may be considered in determining whether a bidder is responsible. Argo challenges the award of the management contract to Swinerton not because petitioners employed such criteria but because petitioners made no determination, either express or implied, that Argo was not responsible. Instead, it is asserted, petitioners found Swinerton to be the relatively superior bidder and awarded the contract on this basis. Argo cogently argues: "To permit a local public works contracting agency to expressly or impliedly reject the bid of a qualified and responsible lowest monetary bidder in favor of a higher bidder deemed to be more qualified frustrates the very purpose of competitive bidding laws and violates the interest of the public in having public works projects awarded without favoritism, without excessive cost, and constructed at the lowest price consistent with the reasonable quality and expectation of completion."

We agree with these assertions, and we hold that the contract for a public construction project must be awarded to the lowest monetary bidder as commanded by section 25454 unless it is found that the lowest bidder is not responsible, in the sense defined above. There is no basis for the application of a relative superiority concept under that section, and if petitioners applied such standard in selecting Swinerton rather than Argo as the contractor the award cannot stand.[5]

---

[5] *West* v. *Oakland, supra,* 30 Cal.App. 556, 560, states: "The term 'lowest responsible bidder' has been held to mean the lowest bidder whose offer *best* responds in

The trial court found that petitioners chose to award the contract to Swinerton because they viewed Swinerton as more qualified than Argo and that the qualifications of Argo to perform the contract were never questioned. An examination of the procedure followed in making the award lends credence to the trial court findings.

Petitioners proceeded as follows: The "Notice Inviting Bids" for the fee to be charged the Authority as management contractor stated, inter alia, that final evaluation and award would be made on the basis of the proposal submitted by the lowest responsible bidder, the contractor's financial resources, his surety and insurance experience, construction experience, completion ability, personnel, equipment, work load, and other factors pertinent to a project of the scope involved. Bidders were required to include eight informational items in their bids, the first six of which related to financial responsibility.[6] A uniform point system was applied to the financial responsibility information submitted. The highest score attainable was 38, but any contractor who scored 30 or more on this scale was to be considered "qualified."

Twelve bids were received. They were reviewed, analyzed, and evaluated by Luckman as an architect and by the staff of the director of public works of the city (reviewing panel). The bids of nine were rejected, and it was ultimately determined that Argo and Swinerton were among the three lowest bidders. Under the formula applied to determine the total bid cost Argo's bid was some $70,000 lower than that of Swinerton.[7]

---

quality, fitness, and capacity to the particular requirements of the proposed work." (Italics added.) While it is possible to interpret the use of the term "best" as meaning that the standard to be applied is one of relative superiority, an examination of the holding of *West* as well as other cases which quote its language (e.g., *Raymond* v. *Fresno City Unified Sch. Dist., supra,* 123 Cal.App.2d 626, 629) reveals that this is not the intention since these cases hold that the lowest bidder was properly rejected as not responsible either because (as in *West*) his product was not satisfactory or (as in *Raymond*) because he was found to have provided poor workmanship in another public project.

[6]The eight informational items were: (1) financial statement; (2) letter of credit from bidder's bank showing credit available and bidder's borrowing experience over the past five years; (3) name of bidder's surety company and broker and number of times, if any, surety had to complete any of bidder's work during past five years; (4) names of other surety companies used in past five years; (5) names of insurance companies and their brokers; (6) statement of insurance losses incurred during past five years and of workmen's accidental deaths during that period; (7) best estimate of cost of the work; (8) estimated progress schedule for completion of the work.

[7]Petitioners make the belated suggestion that Argo was not in fact the lowest monetary bidder because, according to its bid, 42 months would be required to complete the contract, while Swinerton estimated only 30 months. The argument is made that in view of escalating costs the shorter construction period would result

Swinerton achieved 34 on the financial responsibility information questionnaire, while Argo obtained a score of 30, the minimum necessary for qualification.

Thereafter, each of the three lowest bidders was interviewed by the reviewing panel, and further information was sought with respect to its experience and capabilities. The three contractors were evaluated in terms of their construction experience, completion ability, personnel, work load, and client relationships. Again, a uniform point system was applied, this time to reflect the performance capabilities of the three low bidders. Out of a maximum of 61 points, Swinerton rated highest with 55 points, while Argo scored second with 42 points.

The reviewing panel, in a report to the Authority which set forth the details of the procedure it had followed in its investigations including the results of the evaluation scores attained by Swinerton and Argo, recommended that Swinerton be awarded the contract as the lowest responsible bidder. The report did not state that Argo was unqualified to perform the job but pointed out that, based upon the evaluation scores and the interviews, the panel believed that by selecting Swinerton the city would obtain excellent construction talent, experience, and other qualities important to the successful completion of the project. The architect representative on the panel, in a separate report to the Authority, stated that while Argo was considered capable within its field of construction, Swinerton's qualifications were considered to be so superior as to justify its selection as the lowest responsible bidder.

The recommendations of the reviewing panel were discussed by members of the Authority on December 17, 1970. At that meeting, the public works director, a member of the panel, explained the panel's choice of Swinerton. He emphasized, for example, that Argo was primarily a school contractor and the maximum height it had built was four stories, whereas Swinerton had experience with high rise structures (the city's project was deemed a high rise building). He offered other reasons as well for the panel's choice of Swinerton over Argo. Representatives of Argo contended at the meeting that the contract could only be awarded to Swinerton if the Authority found Argo to be irresponsible, and that Argo was in fact qualified to do the job.

in substantial savings. However, both at the trial court level and in the petition for writs of mandate and prohibition filed before the Court of Appeal, petitioners conceded that Argo was determined by the reviewing panel and found by the Authority to be the lowest monetary bidder, although not the lowest responsible bidder. In view of these concessions, petitioners may not now claim that Argo, because of its longer estimated completion time, was not the lowest monetary bidder.

The Authority adopted a resolution awarding the contract to Swinerton. The resolution pointed out that both the architect and the public works department had submitted their reports and had recommended that the contract be awarded to Swinerton, and that their recommendations were based upon a bid evaluation procedure which included such categories as construction experience, financial qualifications, and similar factors. The resolution concluded with the statement that the Authority finds that the lowest responsible bid was submitted by Swinerton, based upon the report of the reviewing panel and the fact that Swinerton had obtained the highest scores on both the financial responsibility and performance capability questionnaires.

It is evident from the procedure followed by the Authority that, as Argo charges and the trial court found, petitioner merely determined that Swinerton was superior to Argo in its ability to perform the contract, and that no determination was made whether in fact Argo, the lowest bidder, was also qualified to perform the contract. Since petitioners did not comply with the mandate of section 25454 that the contract be awarded to the lowest responsible bidder, the award must be set aside. (*Miller* v. *McKinnon* (1942) 20 Cal.2d 83, 87-88 [124 P.2d 34, 140 A.L.R. 570].)[8]

### III

■ Finally, it is contended that the award to Swinerton must be set aside because Argo was not afforded a full evidentiary hearing as to whether it was a responsible bidder.[9] Due process requires, asserts Argo, that prior to awarding a contract to one who is not the low monetary bidder, the Authority must conduct a hearing, which shall include a full panoply of judicial trial procedures, including pleadings, cross-examination of witnesses, and formal findings. No case so holding is called to our attention, and *Housing Authority of Opelousas, La.* v. *Pittman Const.*

---

[8]The parties argue at some length about the question whether the findings of a governing body that a contractor is not the lowest responsible bidder may only be attacked for fraud and collusion (see, e.g., *West* v. *Oakland, supra,* 30 Cal.App. 556, 560-561) or whether it is sufficient to establish an abuse of discretion (see, e.g., *Diablo Beacon Printing & Pub. Co.* v. *City of Concord* (1964) 229 Cal.App.2d 505, 508 [40 Cal.Rptr. 443]). We need not discuss this issue since we have concluded that no finding express or implied was made by petitioners that Argo was not a responsible bidder.

[9]Since we hold the award improper on other grounds it is not necessary to decide whether the lowest monetary bidder is entitled to a hearing before the contract is awarded to another. However, a discussion of this matter may be of assistance to guide petitioners in any new proceedings relating to a subsequent award of the contract.

*Co.* (5th Cir. 1959) 264 F.2d 695, upon which Argo places great reliance, is to the contrary.

In that case, Louisiana law provided that a public works contract must be awarded to the lowest responsible bidder, but a higher bidder had received the award primarily on the basis of evidence received by the awarding authority from the higher bidder casting doubt upon the low bidder's responsibility. The contractor submitting the low bid was not present at the meeting and was not afforded an opportunity to rebut the charges prior to the award. It was held that the low bidder was entitled to be informed of the charges made against him and to reply to those charges. However, opined the court, the awarding authority was not required to "conduct FBI investigations, hold elaborate hearings, adhere to legal rules of evidence, and function as a judicial body." (264 F.2d at p. 704.)

We hold that prior to awarding a public works contract to other than the lowest bidder, a public body must notify the low monetary bidder of any evidence reflecting upon his responsibility received from others or adduced as a result of independent investigation, afford him an opportunity to rebut such adverse evidence, and permit him to present evidence that he is qualified to perform the contract. We do not believe, however, that due process compels a quasi-judicial proceeding prior to rejection of the low monetary bidder as a nonresponsible bidder.

Let a peremptory writ of mandate issue directing the trial court to vacate its judgment and the peremptory writ of mandate issued thereon and to make new findings and conclusions of law and enter a new judgment in accordance with the principles set forth herein.[10]

Peters, J., Tobriner, J., and Sullivan, J., concurred.

---

[10]This order is without prejudice to appropriate action by any party seeking further relief in the light of events which have transpired subsequent to the entry of the trial court's judgment. The judgment expressly provided that it should not be construed to prevent the Authority from acting as owner-builder and from letting all necessary construction contracts in connection with the project. We have been informed by the parties that such construction contracts have been awarded, and that the actual work of construction is under way. Petitioners obtained a stay from the Court of Appeal which had the effect of permitting the Authority to enter into a new and separate contract with Swinerton for consulting and supervising services in connection with the project, without prejudice to the validity of any such new contract. However, we have not been advised whether the Authority has availed itself of Swinerton's services, nor have we been informed whether the services of a management contractor are still required in view of the progress of the construction work.

**BURKE, J.**—I dissent. If this case had involved an ordinary muncipal construction contract, I would concur without reservation in the view that a "relative superiority" test is inappropriate to determine the "lowest responsible bidder," as that phrase is used in applicable charter or statutory provisions. It seems evident to me, however, that the management contract here at issue was more in the nature of a contract for services as a consultant and supervisor-manager, and that in the award of such contracts the governing board may properly consider a number of factors in addition to the amount bid in discharging its responsibility.

In the instant case, the services to be rendered by the management contractor may be likened to those provided by the Authority's architectural firm, and indeed those services were proposed by the architect to complement its own services in preparing final plans and specifications and in supervising the work of construction, in an attempt to provide the city and the Authority with the most efficient and desirable construction at the lowest cost. The management contractor was to perform no actual work of construction nor furnish any materials, labor, supplies or equipment for the project. All of such work and materials were to be let out to bid to the lowest responsible bidders in subsequent bidding under the traditional bidding procedure applicable to ordinary lump sum contracts. At the time when Swinerton was chosen as the management contractor, only the preliminary plans for the project had been prepared; bids for the actual work of construction were to await completed final plans and specifications, which the management contractor would assist in preparing.

As the majority acknowledge, strict compliance with competitive bidding requirements need not be maintained in procuring an expert's services to prepare plans and specifications. (*Kennedy* v. *Ross,* 28 Cal.2d 569, 581 [170 P.2d 904] [engineer retained to prepare plans for sewage treatment and disposal plant].) As noted in *San Francisco* v. *Boyd,* 17 Cal.2d 606, 620 [110 P.2d 1036], "The employment of a person who is highly and technically skilled in his science or profession is one which may properly be made without competitive bidding." In *San Francisco,* the approved employment was of a civil engineer to aid in the solution of traffic and transit problems. (See also *Cobb* v. *Pasadena City Bd. of Education,* 134 Cal.App.2d 93, 95 [285 P.2d 41].)

I do agree, however, that the management contract in the instant case contains certain provisions, such as the "guaranteed outside price" clause, which justified the Authority's action in requiring that contract to be competitively bid. Yet as the management contract is more in the nature of a contract for expert services than an ordinary lump sum construction

contract, I would construe the applicable competitive bidding provisions liberally to provide the Authority the broadest discretion consistent with protecting the taxpayers from fraud, favoritism or collusion. The bid evaluation system used by the Authority in the instant case, permitting it to consider the respective quality, fitness and capacity of bidders in accordance with preselected and announced, objective standards and criteria, satisfactorily met the competitive bid requirements in this case.

The majority opinion accurately describes the elaborate rating and evaluation system used by the Authority to determine which bidder would be chosen as the "lowest responsible bidder." I would emphasize that every bidder was given advance notice of the bid evaluation system; bidders were told that an award would be made on the basis of the bidder's financial resources, surety and insurance experience, construction experience, completion ability, personnel, equipment and work load, as well as the amount of the bid. On the basis of the information received from the bidders, bids were evaluated or rated in accordance with a uniform point system reflecting the performance capabilities of each bidder. In short, the evaluation system employed in the instant case seems well suited to achieve an accurate assessment of the bidder's qualifications while minimizing the risks of favoritism or collusion. It is significant that at no time prior to the bid opening did Argo or any of the bidders object to the method of evaluating or awarding bids or to the method of bid solicitation. And nothing in the record suggests that the Authority may have acted with an improper motive in awarding the contract to Swinerton.

As the majority concede, the term "lowest responsible bidder" is broad enough to include the attributes of quality, fitness and capacity to perform. (See *Raymond* v. *Fresno City Unified Sch. Dist.,* 123 Cal.App.2d 626, 629 [267 P.2d 69]; *Swanson* v. *Hilderbrand,* 94 Cal.App.2d 161, 164 [210 P.2d 95]; *Cyr* v. *White,* 83 Cal.App.2d 22, 27-29 [187 P.2d 834]; *Hodgeman* v. *City of San Diego,* 53 Cal.App.2d 610, 615-616 [128 P.2d 412]; *West* v. *Oakland,* 30 Cal.App. 556, 560-561 [159 P. 202]; 10 McQuillan, Municipal Corporations, §§ 29.73, 29.73a, pp. 423-425, 429-430.)[1] In the context of the "hybrid" management contract involved

[1] As stated in the *West* case, "There are many occasions in the experiences of municipal government when the quality of the thing to be supplied in the course of the public service depends upon conditions which differentiate bidders, and require the exercise of a sound discretion on the part of city officials in determining whether the wares or device which each individual bidder offers in the form of his own exclusive design are such as will meet the particular requirements of the intended work. In order to cover such cases it is quite usual in the provisions of city charters to

herein, I see no reason whatever for denying the Authority the right to evaluate, on the basis of objective criteria selected and announced in advance of bid solicitation, the quality, fitness and capacity of the respective bidders, and to award that contract to the bidder shown by application of those criteria to be the best qualified.

I would hold that the Authority's award to Swinerton was within its powers and did not constitute an abuse of its discretion. Accordingly, I would annul the trial court's judgment in its entirety.

Wright, C. J., and McComb, J., concurred.

---

find such terms as 'lowest and best bidder,' or as 'lowest responsible bidder,' and the like; and these phrases have been given by the courts a particular meaning, in which it must be presumed they are used by the framers of city charters in the absence of other limiting clauses. The term 'lowest responsible bidder' has been held to mean the lowest bidder whose offer best responds in quality, fitness, and capacity to the particular requirements of the proposed work; and that where by the use of these terms the council has been invested with discretionary power as to which is the lowest responsible bidder, having regard to the quality and adaptability of the material or article to the particular requirements of its use, such discretion will not be interfered with by the courts in the absence of direct averments and proof of fraud. [Citation.]" (30 Cal.App. at p. 560.)