ASSOCIATED GENERAL CONTRAC-
TORS OF CALIFORNIA, INC., a non-
profit California corporation; Balliet
Brothers, a California corporation;
William P. Young, Inc., a California
corporation; Under-Ground Construc-
tion, a California corporation; Webcor
Builders, a California corporation; and
Guy F. Atkinson, a Nevada corporation,
Plaintiffs,

v.

CITY AND COUNTY OF SAN
FRANCISCO, Defendant.

San Francisco Black Chamber of Com-
merce, et al., Defendant-Intervenors.

No. C 84–6899 TEH.

United States District Court,
N.D. California.

Aug. 7, 1985.

Ronald A. Zumbrun, John H. Findley, Pacific Legal Foundation, Sacramento, Cal., Eva Jefferson Paterson, San Francisco Lawyers' Committee for Urban Affairs, Robert L. Harris, Charles Houston Bar Ass'n, Edwin M. Lee, William R. Tamayo, Asian Law Caucus, Judith Kurtz, Shauna Marshall, Equal Rights Advocates, San Francisco, Cal., William C. McNeill, III, Pearl, McNeill, Gillespie & Standish, Oakland, Cal., for defendants-intervenors.

James W. Polk, Associated Gen. Contractors of California, West Sacramento, Cal., for plaintiffs.

George Agnost, City Atty., Philip S. Ward, Chief Trial Deputy, Burk E. Delventhal, Mara E. Rosales, Deputy City Attys., San Francisco, Cal., for city defendant.

## OPINION AND ORDER

THELTON E. HENDERSON, District Judge.

This case comes before the court on the cross-motions of plaintiffs, defendant, and defendant-intervenors, for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. The parties having fully briefed the issues, the matter was submitted without oral argument on June 3, 1985. After careful consideration of the parties' papers, and the entire record herein, the Court determines that there is no genuine dispute over a material issue of fact, and that defendant and defendant-intervenors are entitled to judgment as a matter of law. *Deukmejian v. United States Postal Service*, 734 F.2d 460, 462 (9th Cir.1984). Accordingly, and for the reasons set forth below, defendant and defendant-intervenor's motions for summary

judgment are HEREBY GRANTED and plaintiffs' motion for summary judgment is HEREBY DENIED.

The instant action concerns a facial attack upon the validity of the Minority/Women/Local Business Utilization Ordinance, Chapter 12D of the San Francisco Administrative Code (hereafter "Ordinance"), enacted by the Board of Supervisors (hereafter "Board") of the City and County of San Francisco (hereafter "City") on April 2, 1984. The Ordinance represents the culmination of a long effort by the Board and members of the community to increase the participation of minority and women business enterprises (hereafter "MBE's" and "WBE's") in municipal contracting, by seeking to remedy the effects of past discrimination against such businesses in this area.[1]

To this end, the Ordinance provides, *inter alia*, that City departments set aside 10% and 2% of their total eligible contract dollars for minority and women business enterprises, respectively. This 12% set aside is subsumed in an overall goal of awarding 30% and 10% of contract dollars to minority and women business enterprises, respectively. The Ordinance also affords minority and women enterprises a 5% bidding preference to aid achievement of the above set asides and goals. The 5% bidding preference is also extended to local business enterprises. These and other provisions of the Ordinance are explained more fully, *infra*, and in this Court's Findings of Fact and Conclusions of Law re: Preliminary Injunction, filed January 8, 1985 (hereafter "Findings and Conclusions").

---

1. Efforts to improve minority and female participation in municipal contracting in San Francisco began with the enactment of Administrative Code Chapter 12(B) which prohibits contractors from discriminating in their employment practices on the basis of race or sex. As the Human Rights Commission of San Francisco ("HRC") administered Chapter 12(B), it determined that effectuation of its goals could only be achieved if minority entrepreneurs were also given an opportunity to develop and gain a foothold in the marketplace. Eventually, Chapter 12(B) was amended to include affirmative action pro-

visions requiring contractors to award a portion of their subcontracts to minority business enterprises. Exploration into the instant Ordinance was prompted by the Board's concern that the City's efforts to date had not significantly increased minority and female participation in City contracts and by complaints to the HRC that the subcontracting requirements, though helpful, were not providing minority and women business enterprises with sufficient opportunities and experience to enable them to obtain prime contracts with the City.

Plaintiffs seek injunctive and declaratory relief invalidating the Ordinance on the grounds that its provisions violate 1) Section 7.200 of the San Francisco Charter (hereafter "Charter"), 2) 42 U.S.C. §§ 1981, 1983, 2000d, and 3) the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. In addressing these cross-motions, the court turns first to the pendent claim, since its resolution could moot or modify the need for constitutional adjudication. *Hagans v. Lavine,* 415 U.S. 528, 545–47, 94 S.Ct. 1372, 1383–84, 39 L.Ed.2d 577 (1974).

## I.

San Francisco Charter § 7.200 provides, in relevant part, that public works contracts in excess of $15,000 be let by City departments to the "lowest, reliable and responsible bidder". While an ordinance is invalid if it conflicts with a city's charter, *Acton v. Henderson,* 150 Cal.App.2d 1, 13, 309 P.2d 481, 487 (1957), we reject plaintiffs' contention that the Ordinance (to the extent it concerns public works contracts exceeding $15,000.) conflicts with § 7.200 because the phrase "lowest, reliable and responsible bidder" can only refer to price and quality of work, and therefore necessarily prohibits adoption of any affirmative action program regarding city contracts covered by that section.

■ We believe our discussion of this issue in our Findings and Conclusions fully explains our reasoning on this issue. There we stated that "[i]n determining whether ... [the Ordinance conflicts with the Charter] ..., the following well settled rules apply. A city, such as San Francisco, which operates under a 'home-rule' charter, has full sovereign powers to regulate municipal affairs. The charter is not a grant of power, but only acts as a limitation. Thus, it should be liberally construed, and only when it *expressly* prohibits the ordinance, does it render the ordinance invalid. *City of Glendale v. Trondsen,* 48 Cal.2d 93, 308 P.2d 1 (1957); *City of Grass Valley v. Walkinshaw,* 34 Cal.2d 595, 212 P.2d 894 (1949); *Acton, supra,* 150

Cal.App.2d at 13–15, 309 P.2d at 487–88. Thus, in construing the charter, no restrictions may be implied. *Miller v. City of Sacramento,* 66 Cal.App.3d 863, 867, 136 Cal.Rptr. 315, 318 (1977)."

"Given the above, a 'construction in favor of the exercise of the power and against the existence of any limitation or restriction thereon which is not expressly stated ... is clearly indicated.' *Acton, supra,* 150 Cal.App.2d at 13, 309 P.2d at 487. In sum, ordinances enacted pursuant to competent authority enjoy a strong presumption of validity and 'Courts are bound to uphold [them] unless they manifestly transcend the powers of the enacting body.' *Glass v. City of Fresno,* 17 Cal.App.2d 555, 560, 62 P.2d 765, 768 (1936); *Brown v. City of Berkeley,* 57 Cal.App.3d 223, 231, 129 Cal.Rptr. 1, 4–5 (1976)."

"In addition, it is well established that, in determining whether a conflict exists between a state statute and the state constitution, the legislature's construction of the constitutional provision at issue is ' "of very persuasive significance" ', and should not be rejected unless ' "unreasonable or arbitrary." ' *Methodist Hospital of Sacramento v. Saylor,* 5 Cal.3d 685, 691–95, 488 P.2d 161, 164–67, 97 Cal.Rptr. 1, 4–7 (1971). Given that the Charter is the City's 'constitution', *Brown, supra,* 57 Cal.App.3d at 230–31, 129 Cal.Rptr. at 4, and is governed by the same principles, *Adams v. Wolff,* 84 Cal.App.2d 435, 441, 190 P.2d 665, 670 (1948), the above rule of construction appears instructive in this case as well. *Cf. Franklin v. Peterson,* 87 C.A.[Cal. App.]2d 727, 730, 197 P.2d 788, 790 (1948)."

■ "In light of the above, this Court concludes that section 7.200 of the Charter does not prohibit adoption of the Ordinance. The term 'responsible' is broad and does not expressly or necessarily require an interpretation narrowly limiting its scope to 'work quality.' Rather, the concept of responsibility is sufficiently flexible to embody other legitimate municipal concerns such as the remedying of past discrimination. Moreover, this Court finds no indication that the drafters of the 1932

Charter intended to preclude the City, by way of § 7.200, from redressing the effects of past or continuing discrimination."

"This view is in accord with the City's construction of section 7.200 (see Findings of Fact #25)[2], as well as with several court decisions interpreting similar or identical bidding provisions. For example, in *Weiner v. Cuyahoga Community College Dist.*, 19 Ohio St.2d 35, 39, 249 N.E.2d 907, 910 (1969), *cert. denied*, 396 U.S. 1004 [90 S.Ct. 554, 24 L.Ed.2d 495] (1970), the Ohio Supreme Court stated 'the capacity to assure a performance which complies with antidiscrimination laws is reasonably a part of the standard of a best or responsible bidder on a contract involving the expenditure of public funds.' Similarly, in *Southwest Washington, Nat'l Electrical Contractor Ass'n v. Pierce County*, 100 Wash.2d 109, 115, 667 P.2d 1092, 1096 (1983), the Washington Supreme Court found 'in the word "responsible" a legislative intent that "the *social* responsibility of the contractor should also be a concern." ' (emphasis in original) (citing *S.N. Nielsen Co. v. Public Bldg. Comm'n*, 81 Ill.2d [290] at 299 [43 Ill.Dec. 40], 410 N.E.2d 40 (1980)."

"As the Washington court noted, the more liberal construction, adopted here, is clearly consistent with the two purposes generally underlying competitive bidding statutes: 1) to protect the general public from cronyism or collusion in the awarding of contracts and, 2) to provide a fair forum for potential bidders. 'Permitting rejection of bids due to failure to meet published affirmative action requirements presents no danger of fraud, collusion, or favoritism and in fact advances the broader public interest by alleviating the effects of past discrimination. Affirmative action requirements further the second purpose of competitive bidding in its broader sense, by providing a fairer forum for subcontractors disadvantaged by the effects of past dis-

crimination.' *Southwest Washington, supra*, 100 Wash.2d at 116, 667 P.2d at 1096."

"In sum, section 7.200 does not, expressly or by neccessary implication, prohibit the City from considering affirmative action requirements in determining whether a bid is 'responsible.' Accordingly, the Ordinance does not conflict with, and therefore, does not violate, the City's Charter.

"Plaintiff's reliance on *Associated General Contractors v. San Francisco Unified School District*, 616 F.2d 1381 (9th Cir.), *cert. denied*, 449 U.S. 1061 [101 S.Ct. 783, 66 L.Ed.2d 603] (1980), is misplaced. In *Associated General*, the San Francisco School Board adopted an affirmative action policy to increase the number of minority firms awarded construction contracts. The policy declared that contractors who failed to comply with the policy were not 'responsible bidders' for purposes of Calif. Education Code § 15951 (now § 39640) which requires school construction contracts to be award to the 'lowest responsible bidder.' *Id.* at 1383."

"The Court, however, interpreted Educ. Code § 15851 [15951] to allow the Board to consider *only* the amount of the bid and the bidder's ability to complete the job. *Id.* at 1385. Since the School Board's authority is *limited to that provided by Education Code § 35160*, which allows adoption of programs not in conflict with any law, the Court found that the Board lacked authority to adopt the affirmative action policy because it conflicted with Educ.Code § 15951."

In determining the scope of the Educ. Code § 15951, the Court relied on *City of Inglewood-Los Angeles County Civic Center Authority v. Superior Court*, 7 Cal.3d 861, 500 P.2d 601, 103 Cal.Rptr. 689, (1972), which involved interpretation of a similar 'competitive bidding' provision in former Gov't Code § 25454 (now Cal.Pub.Con.Code § 20128). In *Inglewood*, the City of Inglewood and the County of Los Angeles entered into a joint exercise of powers agree-

---

**2.** Finding of Fact No. 25 states in part that "[t]he Board has interpreted the term 'responsible' so as to allow consideration of matters of public interest and concern in addition to the quality of the work and the fitness of the contractor to perform the services".

ment for the purpose of creating a civic center. The agreement created a separate entity (apart from the City and County) to implement the agreement, which specified that the joint-powers entity was subject to the same restrictions as " 'are imposed upon the county in the exercise of similar powers.' " *Id.* at 864–65 at n. 2, 500 P.2d at 603, 103 Cal.Rptr. at 691. Like the school board, counties only have the powers granted to them by the California constitution or statutes. *McCafferty v. Board of Supervisors,* 3 Cal.App.3d 190, 192, 83 Cal.Rptr. 229, 230 (1969). The Court held that the joint-power entity, had no authority to consider the "relative superiority" of the bidders because such considerations conflicted with the requirement of Gov't Code § 25454 that contracts be awarded to the lowest responsible bidder. The Court interpreted that section to require that 'a contract must be awarded to the lowest bidder unless it is found that he is not responsible, *i.e.,* not qualified to do the particular work under consideration.' *Inglewood, supra,* 7 Cal.3d at 867, 500 P.2d at 604, 103 Cal.Rptr. at 692."

"At the outset, this Court notes that the interpretation of similar words in other statutes is not controlling, *In re Baby Boy T.,* 9 Cal.App.3d 815, 819, 88 Cal.Rptr. 418, 420 (1970). *Gleason v. City of Santa Monica,* 207 Cal.App.2d 458, 461, 24 Cal.Rptr. 656, 657 (1962), and that the *Inglewood, supra,* case was not decided in the context of affirmative action efforts. More fundamentally, however, those cases arose in a completely different context. They did not involve home-rule cities, such as San Francisco, acting pursuant to their full sovereign powers to regulate municipal affairs subject to *express* limitations in the Charter. Rather, they involved entities which acted from a much more limited authority, as described above. [For example, the School District can exercise only those powers delegated to it in the Education Code]. Thus, ... [those entities] were in a completely different posture with respect to the code provisions than is San Francisco with respect to its Charter. Thus, the holdings in *Associated Contractors, supra,*

and *Inglewood, supra,* do not compel a similar construction of the bidding provision in the case at bar." (at pp. 15–20).

Similarly, *San Francisco Fire Fighters v. City and County of San Francisco,* 68 Cal.App.3d 896, 137 Cal.Rptr. 607 (1977), does not assist plaintiffs' position. There, the Charter provision at issue *expressly* conferred upon the Fire Commission the power to formulate reasonable rules and regulations concerning its employees. Nevertheless, the City mayor, Board of Supervisors, and Fire Commission entered into a binding agreement with the firefighters union which, in effect, surrendered the Fire Commission's authority concerning employment regulations to an arbitrator. The Court of. Appeal held that such a delegation was impermissible in light of the Charter's provisions.

Here, Charter section 7.200 permits all City departments, including the Board of Supervisors, to let public works contracts. The Ordinance does not divest City departments of this responsibility; nor does the Charter expressly confer upon any board, commission or official the exclusive right to regulate City procurement practices. Thus, we do not find that *San Francisco Fire Fighters, supra,* suggests that the Board acted beyond the scope of its powers in the case at bar.

## II.

We next turn to the equal protection and federal statutory claims, the latter of which are subsumed in the equal protection analysis. *Ohio Contractors Ass'n v. Keip,* 713 F.2d 167, 175 (6th Cir.1983); *Bratton v. City of Detroit,* 704 F.2d 878, 887 (6th Cir.1983).

In *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), the Supreme Court, in three plurality opinions, upheld the constitutionality of a Congressional statute requiring local governments to allot 10% of federal monies, received pursuant to a federal public works program,. for minority contractors. In his concurrence, Justice Marshall reasoned that

while "... racial classifications are prohibited if they are irrelevant", this principle is "... inapposite to racial classifications that provide benefits to minorities for the purpose of remedying the present effects of past racial discrimination." Such classifications, the Concurrence continued, "... may disadvantage some whites, but whites as a class lack the ' "traditional indicia of suspectness: the class is not saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." ' " *Id.* at 518, 100 S.Ct. at 2795 (Marshall, J., Brennan, J., Blackmun, J., concurring) (citations omitted). The Concurrence then concluded that "[b]ecause the consideration of race is relevant to remedying the continuing effects of past discrimination, and because governmental programs employing racial classifications for remedial purposes can be crafted to avoid stigmatization, ... such programs should not be subjected to conventional 'strict scruity'—scrutiny that is strict in theory, but fatal in fact." *Id.* at 519, 100 S.Ct. at 2795.

Although no one approach commanded a majority of the *Fullilove* Court, lower courts, drawing from the above analysis, and other opinions rendered in the case, have distilled a three-part test to measure the constitutionality of affirmative action legislation. This test, enunciated in *South Florida Chapter of the Associated General Contractors v. Metropolitan Dade County, Fla.,* 723 F.2d 846 (11th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984) and *Southwest Washington Chapter, National Electrical Contractors Ass'n v. Pierce County,* 100 Wash.2d 109, 667 P.2d 1092 (1983), is essentially as follows:

a) Does the legislative body have authority to enact remedial legislation to redress past discrimination?

b) Have adequate findings been made to ensure the legislative body is acting for the purpose of remedying the effects of past discrimination? and,

c) Is the remedial legislation narrowly tailored to meet its objectives?

*See also, Ohio Contractors Ass'n v. Keip,* 713 F.2d 167 (6th Cir.1983); *Michigan Road Builders Ass'n, Inc. v. Milliken,* 571 F.Supp. 173, (E.D.Mich.1983), *appeal dismissed,* 742 F.2d 1456 (6th Cir.1984).

■ We conclude that the above approach takes into account the primary issues and concerns reflected in the *Fullilove* opinions and is the appropriate standard by which to adjudge the constitutionality of the Ordinance in the case at bar. We further find that the Ordinance satisfies each element of this test as discussed in our Findings and Conclusions at pp. 21–25. There, we stated as follows:

*"The City's Authority*

The City is a political subdivision of the State of California and is bound to guarantee equal protection of the laws to all citizens. As such, no provision is required to authorize a local government to enact legislation to prevent the denial of equal protection to persons within its jurisdiction. The prohibition against denial of equal protection carries with it the power to prevent such denial and to remedy past violations."

"The above, taken together with the broad 'home-rule' [and inherent police powers] the City enjoys, gives the Board ample authority to study the effects of past discrimination and to fashion proper remedies in San Francisco with respect to procurement contracts. *Metropolitan Dade County, Fla., supra,* 723 F.2d at 852; *Pierce County, supra,* 100 Wash.2d at 123, 667 P.2d at 1100."

"The Court rejects plaintiffs' contention that, under *Fullilove, supra,* 448 U.S. 448, 100 S.Ct. 2758, only Congress is competent to pass legislation affirmatively addressing the effects of discrimination. We agree with the Eleventh and Sixth Circuits that 'the references in *Fullilove* to Congress' power were not intended to imply that governmental bodies other than Congress may not act to remedy past discrimination, but were only emphasizing the "unequaled"

power of Congress to act under its specific powers granted by the Fourteenth Amendment.' *Metropolitan Dade County, Fla., supra,* 723 F.2d at 852; *Ohio Contractors Ass'n v. Keip, supra,* 713 F.2d at 172."

*"Adequate Findings*

The Findings of the Board, discussed in the [Findings and Conclusions] [3], are adequate to satisfy this prong of the test. The Board is not required to find that the City has intentionally discriminated against minority contractors. *Fullilove, supra,* 448 U.S. at 478, 100 S.Ct. at 2774. Such a requirement would practically preclude remedial efforts because the legislative body would not risk the liability such an admission might bring. Rather, it is only necessary that the findings are adequate 'to ensure that the county was acting to remedy the effects of past discrimination rather than advancing one group's interest over another based on a perceived need not founded in fact.' *Metropolitan Dade County, Fla., supra,* 723 F.2d at 853."

"[Here], [t]he City had before it historical and factual data from which it could properly conclude that traditional procurement policies, when applied to minority and women businesses, perpetuated the effects of past discriminatory practices. As did Congress, the Board, 'had before it, among other data, evidence of a long history of marked disparity in the percentage of public contracts awarded to minority business [including evidence of statistical disparity between the percentage of MBE/WBE/s in the City as compared to the percentage of contract dollars awarded MBE/WBE's and statistical disparity between the percentage of minorities and women in the City population and the percentage of contract dollars awarded MBE/WBE's]. This disparity was considered to result not from any lack of capable and qualified minority businesses, but from the existence and maintenance of barriers to competitive access which had their roots in racial and ethnic discrimination, and which continues today, even absent any intentional discrimination or unlawful conduct.' *Fullilove, supra,* 448 U.S. at 478, 100 S.Ct. at 2774. *See also, Metropolitan Dade County, Fla., supra,* 723 F.2d at 853; *Ohio Contractors Ass'n, supra,* 713 F.2d at 171; *Pierce County, supra,* 100 Wash.2d at 123–24, 667 P.2d at 1100."

"Given the findings of the [Human Rights Commission] and the Board, and the fact that racial discrimination is so prevalent in the construction trade that it has been deemed a proper subject for judicial notice, *Local Union No. 35 v. City of Hartford,* 625 F.2d 416, 422 (2nd Cir.1980), *cert. denied,* 453 U.S. 913 [101 S.Ct. 3148, 69 L.Ed.2d 997] (1981), this Court is well satis-

---

**3.** In 1982, the Board directed the HRC to investigate and conduct hearings into the extent of minority and women business participation in City contracts and to report their findings, along with any proposed remedial legislation, to the Board. The HRC contacted 56 City Departments or Bureaus and obtained data on the number and dollar amounts of contracts awarded or let during 1981 and 1982 to minority and women business enterprises. The HRC also conducted interviews with Department personnel and others to determine City practices in this area, and how they affect minority and women business enterprises. Four public hearings were also held in February, March and April of 1983, during which testimony, as well as written submittals, were received.

The findings of the HRC and the Board indicated, among other things, the following: 1) Though MBE's constitute 30% and WBE's between 10 and 15% of San Francisco's business, and though minorities and women constitute nearly 50 and 60% of the City's population, respectively, they were awarded no more than 2.8 percent of all City contracts. The latest U.S. Census data also revealed that 30.59% of all construction firms in San Francisco are minority owned and 10.65% are women owned. 2) City departments and contract awarding authorities were functioning without specific uniform standards and criteria in the award of contracts and leases by the City. This broad discretion was often inexplicably exercised to the disadvantage of MBE's and WBE's. 3) Many seemingly innocent, benign practices kept intact the "old boy" network which effective excluded newcomers, many of which were MBE's and WBE's. 4) Partly due to historic exclusion from the market place, MBE's and WBE's had been unable to acquire the expertise and experience necessary to obtain prime contracts, and 5) Significant measures, including affirmative action, were needed to provide MBE's and WBE's a fair opportunity in the area of municipal contracting.

fied that the Board was acting 'to remedy the effects of past discrimination and was not acting merely to advance one group's interest over another based on a perceived need not founded in fact.' *Metropolitan Dade County, Fla., supra,* 723 F.2d at 852."

"*Narrowly Tailored*

It is not required that the legislative body resort to the least restrictive means possible. *Fullilove, supra,* 448 U.S. at 508, 100 S.Ct. at 2790 (Powell, J., concurring); *Metropolitan Dade County, Fla., supra,* 723 F.2d at 856, and *Ohio Contractors Ass'n, supra,* 713 F.2d at 174. However, the ordinance must 'facially incorporate sufficient safeguards to ensure that it is narrowly tailored to its legitimate objective of redressing past discrimination.' *Metropolitan Dade County, Fla., supra,* 723 F.2d at 853; *see also, Pierce County, supra,* 100 Wash.2d at 124–25, 667 P.2d at 1100."

"A reading of the Ordinance reflects a carefully drafted instrument that allows for the achievement of its objectives while safeguarding the interests of third parties. To begin with, the Ordinance is subject to several levels of administrative review, both on a quarterly and an annual basis, and the rules and regulations implementing it are subject to revision on an annual basis. In addition, the Ordinance is limited in duration, and most importantly, has flexible waiver provisions. *See Pierce County, supra,* 100 Wash.2d at 125, 667 P.2d at 1101 ('The key factor, and the one emphasized by Chief Justice Burger [in *Fullilove* ] is the existence of a flexible waiver scheme')."

"And while the Ordinance has an incidental impact on third parties, the following factors establish that the Ordinance does not unfairly burden them: (1) Non MBE's and non WBE's may participate in set aside contract dollars by owning up to 49% of an MBE or WBE enterprise; (2) non MBE's and WBE's may joint venture with MBE' and WBE's and benefit from set aside contract dollars; (3) the minimum requirements of the Ordinance potentially ensures

only twelve percent of eligible contract City dollars will be awarded to MBE's and WBE's. Assuming that the City meets this total twelve percent set aside, non MBE's and WBE's could qualify for 88% of the City's eligible contract dollars and all exempt and waived City contract dollars not subject to the Ordinance. *See Pierce County, supra,* 100 Wash.2d at 124, 667 P.2d at 1100 ('The burden on nonminority male dominated firms is still relatively light, as they may still compete for 88% of the subcontracting business'). Even assuming the City reaches its 40% goal, non MBE's and non WBE's qualify for at least 60% of all City contract dollars; and (4) no one is excluded from the competitive bidding procedure. *See Fullilove, supra* 448 U.S. at 484, 488 [100 S.Ct. at 2777, 2780]; *Metropolitan Dade County, Fla., supra,* 723 F.2d at 856, n. 15."

As the court recognized in *Ohio Contractor's Ass'n, supra,* 713 F.2d at 173, "[i]t is clear that members of the majority can be required to bear some of the burden which inevitably results from affirmative efforts to rectify past discrimination. Even if it is assumed that the plaintiffs in this action are innocent of discriminatory conduct themselves, they are part of a group which did reap competitive benefit from past discriminatory practices of the state that have virtually excluded minority contractors from state business. It was within the power of the General Assembly to require the non-minority contractors to assume a reasonable burden." We believe that the Ordinance here ensures that majority contractors shall assume no more than a reasonable burden.

▇ For all of the above reasons, we find that the race-conscious provisions of the Ordinance do not offend the guarantees of the equal protection clause of the Federal Constitution. Accordingly, the sex-conscious provisions withstand constitutional scrutiny as well. *See Pierce County, supra,* 100 Wash.2d at 126, 667 P.2d at 1101.

### III.

Plaintiff's final contention is that the 5% bidding preference afforded local business

enterprises (hereafter "LBE's") also violates the Equal Protection Clause. Section 12D.5 of the Ordinance defines "Local Business" as a "business firm with fixed offices or distribution points located within the boundaries of the City and County of San Francisco and listed in the Permits and License Tax Paid File with a San Francisco business street address."

In considering whether legislation regulating economic or commercial matters offends equal protection, courts have traditionally applied a rational basis standard. *Exxon Corp. v. Eagerton*, 462 U.S. 176, 103 S.Ct. 2296, 76 L.Ed.2d 497 (1983). Thus, a state may impose "... more onerous taxes or other burdens on foreign corporations than those imposed on domestic corporations ... [if the] discrimination between foreign and domestic corporations bears a rational relation to a legitimate state purpose." *Western and Southern Life Insurance Co. v. State Bd. of Equalization*, 451 U.S. 648, 668, 101 S.Ct. 2070, 2083 [68 L.Ed.2d 514] (1981). *See also, G.D. Searle & Co. v. Cohn*, 455 U.S. 404, 408 n. 6, 102 S.Ct. 1137, 1142, n. 6 [71 L.Ed.2d 250] (1982) ("Only a rational basis, however, is required to support a distinction between foreign and domestic corporations.")

Relying on the Supreme Court's recent decision in *Metropolitan Life Insurance Co. v. Ward*, — U.S. —, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985), plaintiff contends that the LBE bidding preference is invalid because it was not enacted pursuant to a legitimate state interest. *Metropolitan Life* concerned a challenge to an Alabama statute which taxed domestic insurance companies at a lower rate than out-of-state insurers. The Court found that the statute was designed *solely* to promote or favor domestic industry at the expense of foreign corporations. *Id.* at 1676. Such a "purely and completely discriminatory" motive, the Court concluded, "constitutes the very sort of parochial discrimination that the Equal Protection Clause was intended to prevent." *Id.* at 1681–82. Accordingly, the Court invalidated the statute on the grounds that "promotion of domestic business within a State, by discriminating against foreign corporations that wish to compete by doing business there, is not a legitimate state purpose." *Id.* at 1682–1683.

■ In the case at bar, the LBE bidding preference was enacted in response to findings by the Board that 1) "local businesses which seek to enter into contracts with the City and County of San Francisco are at a competitive disadvantage with business in the City (e.g. higher taxes, higher rents, higher wages and benefits for labor, higher insurance rates, etc.)",[4] and 2) "[t]hat the public interest would best be served by encouraging business to locate and remain in San Francisco through the provision of a minimal 'good faith' preference to local businesses in the awarding of City contracts", and 3) "[t]hat policies and programs which enhance the viability of minority-

---

4. The October 30, 1984, declaration of Gail P. Roberts, Coordinator of the Human Rights Commission, states at ¶ 3 that "... local entrepreneurs often complained that non local business often· escaped liability for local business taxes applicable to the work those business[es] did in San Francisco. Local businesses are much more likely to be watched by the Tax Collector. Since local taxes are a significant business cost, the advantages a non local business enjoys over a San Francisco based business are exacerbated when the former escapes liability for taxes that both should pay."

"Many local entrepreneurs complained that this condition threatens to drive them out of San Francisco. Many of these local business provide significant employment for minority and women residents.

"In drafting the ordinance, we were concerned not to exclude form the local business preference any business that employs people locally or pays City taxes, [and contributes] ... to the health of the City's economy."

"Hence, we rejected claims that the Ordinance should embody a preference for business with their headquarters or principal place of business in San Francisco. In our view, any business that had an office here and complied with City business tax registration requirements contributes to the local economy. Ensuring that non local businesses pay their taxes, would mitigate some of the disadvantages local businesses suffer but would not erect any commercial barriers around San Francisco or balkanize our local economy."

owned, women-owned, and local businesses will best serve the public interest because the growth and development of such businesses will have a significant positive impact on the economic health of the City." (*See* Ordinance, Sec. 12D.2, ¶¶ 4, 5, and 6).

Also relevant is the Ordinance's "Declaration of Policy" which states in part that the "... ultimate goal ... is to offset some of the economic disadvantages faced by local businesses.... ¶ The City and County of San Francisco is utilizing a preference for local business in the award of City and County contracts in order to encourage business to locate and remain in San Francisco and thereby increase the number of employed persons living in San Francisco. The additional cost to businesses located in San Francisco has been estimated as high as 15%; a preference of 5% for local businesses bidding on City contracts constitutes 'good faith' on the part of the City in support of businesses which contribute to the economic health of the City. The percentage is a reasonable expression of that good faith, does not unduly hamper non-local businesses in the contracting process, and parallels the preferences awarded in many other local jurisdictions." *Id.* at Sec. 12D.3.

While both the instant LBE provision and the Alabama statute were designed to foster growth and development of domestic business, the critical distinction between them is that the Alabama statute was designed solely to provide in-state insurers with an *advantage* over foreign insurers. It was this "purely discriminatory" purpose that the Court found so objectionable in *Metropolitan Life, supra,* 105 S.Ct. at 1676. In contrast, the LBE provision was not prompted by a desire to penalize foreign, or reward, domestic contractors; rather, it was prompted by the Board's findings that disproportionately higher local taxes, rents, wages, etc., put local contractors at a significant disadvantage when competing with foreign contractors. Thus, the Board was attempting to equalize the competitive position of local and non-local contractors, not grant local contractors an impermissible edge. We conclude that this objective does not run afoul of the principles set forth in *Metropolitan Life, supra.*

We find support for this conclusion in *Western and Southern Life Insurance Co., supra,* 451 U.S. 648, 101 S.Ct. 2070. There the Court upheld, against an equal protection challenge, a California "retaliatory" tax on foreign insurers. The tax is triggered if the foreign insurer's state imposes higher taxes on California insurers doing business in the foreign state than California would impose on that insurer's similar activities in California.

As in the case at bar, the thrust of the statute was to equalize the position of domestic and foreign corporations. In discussing the purpose of "retaliatory taxes", the Court cited an A.L.R. survey which stated "... that their ultimate object is not to punish foreign corporations doing business in the state, or retort the action of the foreign state in placing upon corporations of the enacting state doing business therein burdens heavier than those imposed upon corporations of such foreign state doing business in the enacting state, but to induce such foreign state to show the same consideration to coprorations of the enacting state doing business therein as is shown to coprorations of such foreign state doing business in the enacting state." *Western and Southern Life Insurance Co., supra,* 451 U.S. at 668–69, 101 S.Ct. at 2083 (*citing* Annot., 91 A.L.R. 795 (1934)).

We believe that the purpose and effect of the LBE preference at issue here is more akin to the permissible California "retaliatory tax" than to the Alabama statute presented in *Metropolitan Life, supra.* The Supreme Court specifically acknowledged the above differences between the Alabama and California statutes when it noted that the "crucial distinction" between the two was that Alabama's was "... designed only to favor domestic industry within the State, no matter what the cost to foreign corporations also seeking to do business there.... contrary to [the] California ... [statute]." *Id.* 105 S.Ct. at 1681.

Thus, while a locality cannot, consistent with equal protection guaranties, treat foreign businesses differently than domestic businesses for the sole purpose of discriminating against foreign (or favoring domestic) businesses, we do not believe, for the reasons stated above, that the 5% LBE bidding preference derives from such an improper purpose. Additionally, we note that plaintiffs do not allege that the LBE provision is not rationally related to its stated purpose, and we conclude that such a relationship does exist. Accordingly, the LBE provision withstands scrutiny under the "rational basis" test; and thus, under the Equal Protection Clause of the United States Constitution.

IT IS SO ORDERED.