DECISION
This is an action for declaratory relief arising out of the award of a municipal contract by the Barrington School Committee for the services of a construction manager for renovations and additions to the Barrington High School.
In the spring of 1996, the Barrington School Committee organized a High School Building Committee to plan an expansion and renovation of the town's high school. According to the Superintendent of Schools, Ralph A. Malafronte, deficiencies in the facilities were identified in 1990 by the New England Association of Secondary Schools and Colleges, which resulted in the school being placed on warning. Malafronte testified that unless there is "a commitment to address these facilities then Barrington could be placed in a position where we would need to show cause as to why we would not go on probation." (Malafronte depo. at 51)
Patrick A. Guida, an attorney and town resident, was elected chairperson of the seventeen-member committee. The architectural firm of Robinson, Green and Beretta was selected as the architect for the project. Numerous meetings were held with the architect to define the scope of the project. Thomas Zito, the project architect, urged the building committee to engage the services of a construction manager as opposed to retaining a contractor.
The competitive bid that forms the basis of this action was issued on October 7, 1996, in the form of a "Request for Proposal" (RFP) for Construction Management Services. This RFP was drafted by defendant Guida with input from defendant Malafronte and Mr. John Gray, the high school principal.
A preproposal conference was conducted on October 11, 1996, a tour of the facility was undertaken, and bids were due on October 23, 1996. Four prospective bidders attended the conference and subsequently submitted proposals. Those bidders were: H.V. Collins Company (Collins), the plaintiff, which submitted the lowest bid price — $654,893; Dimeo Construction Company (Dimeo), plaintiff intervenor, which submitted the second lowest bid price — $671,950; Gilbane Building Company, a defendant intervenor whose bid price was third highest — $714,750; and 0. Ahlborg, the highest bidder — $850,000 — and not a party to this action. The range in price between Collins, the lowest, and Gilbane and between Dimeo and Gilbane is considerable. Due to deficiencies in the Gilbane bid, the defendants adjusted the other bids downward, resulting in a significant percentage spread from the lowest to the highest bid.
The RFP required a submittal for "The Basic Fees to be Charged to the Various Categories for Services." Gilbane Building Company failed to submit a bid including the cost of the performance and payment bonds, liability insurance, and building permit. Plaintiffs allege this renders the bid nonresponsive and invalid. (See Infra.)
The Barrington School Committee backed out the costs submitted by Collins and Dimeo for the items omitted by Gilbane as follows:
H.V. Collins Dimeo Gilbane
Basic fee to be charged 654,893 671,950 714,750 for the services
Adjustment for Performance (79,495) (71,000) 0 Bond and Builder's Risk 575,398 600,950 714,750
After this calculation is performed, the Collins bid is 24 percent lower than Gilbane, and the Dimeo bid is 19 percent lower than Gilbane. The parties have agreed the cost of the building permit, also omitted by Gilbane, is $32,500. When this figure is subtracted from Collins and Dimeo's bid, the range is even greater:
Gilbane Collins Dimeo
714,750 542,898 568,450 32% 26%
Thus, after this calculation is complete, Gilbane's bid is almost one-third higher than the low bid, Collins, and 26 percent higher than the next lowest bid, Dimeo.
On December 19, 1996, the defendant School Committee awarded the contract to Gilbane. Neither the High School Building Committee nor the School Committee voted to reject the lower bids nor found the lower bidders to be not qualified or not responsible to perform the work. Indeed, the evidence in this case clearly discloses the lower bidders were found to be qualified, but the defendants felt that Gilbane was "superior" or "better" or "more likely" to perform well for the Town.
On December 20, 1996, Collins instituted suit. On December 23, 1996, this Court temporarily restrained the School Committee from awarding the contract. By agreement of the parties, the matter was assigned for a hearing on a preliminary injunction and, by agreement, the matter was consolidated for a hearing on the merits. Plaintiff Dimeo Construction Company, the second-lowest bidder, has intervened without objection.
At trial plaintiff Collins agreed to the dissolution of the restraining order and is now seeking a declaratory judgment declaring that the Gilbane bid was fatally defective and nonresponsive in several material respects. Collins also seeks a declaration that it is the lowest competent and lowest responsive bidder and should be awarded the contract. Finally, Collins and Dimeo allege that the RFP and the action of the Barrington School Committee in its selection of Gilbane violate section 16-2-9 of the Barrington Town Charter and the Municipal Bidding Act §45-55-1, et. seq. "Award of Municipal Contracts."
The evidence in this case consists of the testimony of defendants Guida and Malafronte and Thomas Zito, the architect. Over thirty documentary exhibits, including the depositions of these witnesses, the bid proposal (RFP), the bids of Collins, Dimeo, and Gilbane, a video tape of the December 19, 1996 meeting of the School Committee where the award was made, minutes of the meetings of the Building Committee and the School Committee were introduced and considered by the Court. The parties undertook lengthy and detailed final arguments and have provided the Court with comprehensive pretrial, posttrial and supplementary posttrial memoranda.
The Court has carefully and conscientiously reviewed this evidence and has considered the arguments of counsel in light of the existing statutes and relevant case law. The Court is well aware of the Supreme Court's "ringing admonition" in Truk Away ofRhode Island, Inc. v. Macera Brothers of Cranston, Inc.,643 A.2d 811, 816 (1994), that all Superior Court justices "exercise great care" before vacating an award of either a state or municipal contract. The Court acknowledges the heavy burden of proof imposed upon an unsuccessful bidder that "(t)he judiciary will interfere with an award only when it is shown that an officer or officers charged with the duty of making a decision has acted corruptly or in bad faith, or so unreasonably or so arbitrarily as to be guilty of a palpable abuse of discretion." GilbaneBuilding Co. v Board of Trustees of State Colleges, 107 R.I. 295,267 A.2d 396 (1970; Hajian Associates v. Board of LibraryTrustees/Building Committee, Town of Cumberland, 685 A.2d 283
(R.I. 1996).
For the reasons which follow, the Court finds that plaintiffs have sustained their burden of proof. The Court finds the defendants have violated § 45-55-5 of the General Laws, "Award of Municipal Contracts," and § 16-2-9 of the Town Charter. The Court further finds the conduct of the School Committee in its application and interpretation of the competitive bids and its heavy reliance on matters extraneous to its own proposal has prejudiced the two lower bidders, has unfairly accorded greater weight to the Gilbane bid, and is arbitrary, unreasonable and patently unfair as to amount to a palpable abuse of discretion. Further, in the application of one of the eight criteria, the Court finds the conduct of the School Committee to be so egregious as to amount to bad faith.
The Court does not undertake these findings lightly and is fully mindful of the ringing admonition of the Supreme Court to approach these issues with "grave caution." Truk Away of R.I. v.Macera Bros., 643 A.2d 811 (R.I. 1994). The Court is also mindful of the need for compelling evidence and the high level of deference due to public officials who, often at great personal sacrifice, endeavor to serve the public interest.
However, in all of these cases, Goldman, Gilbane, Truk Away,Nelson's Bus, and Hajian, the Supreme Court has consistently recognized and reaffirmed its belief that "courts can and will recognize corruption, bad faith or a manifest abuse of discretion when it appears from the evidence presented in a case." Gilbane,
267 A.2d at 400. That is exactly what this evidence discloses.
At the outset, there is no suggestion by anyone, including the trial justice, that there exists any corruption or corrupt motivation behind the award of this contract. The plain fact is that Gilbane was clearly the favorite candidate and was selected in violation of state law in such an arbitrary, capricious, and patently unfair process as to be a palpable abuse of discretion, manifestly unfair and in bad faith.
Gilbane vehemently urges a radical departure from settled law in support of its position. Gilbane suggests that at least in the case of an "evaluated bid" pursuant to § 45-55-5 municipal officials have broad discretion in selecting the "superior" candidate and may overlook or pass over lower qualified bidders who submit responsible proposals and may do so without regard to price. Gilbane analogizes this belief to the unfettered discretion possessed by corporate officials undertaking corporate expenditures. This is simply not the law. To hold otherwise would frustrate the purpose for the enactment of § 45-55-1, to establish a uniform system for the award of these contracts and would, as Dimeo maintains, turn the competitive bidding process into a beauty contest and give rise to favoritism and discrimination.
Gilbane also suggests that because this is a contract for the services of a construction manager who will serve as a "partner" with the town and the architect there is greater latitude afforded municipal officials who are not bound to award the contract to the "responsive and responsible bidder whose bid is the lowest evaluated or responsive bid price," § 45-55-5(5). This argument contravenes § 45-55-4(5) of the statute which defines the term "contract" and specifically includes "construction management" contracts within its definition. Construction management contracts are contracts which fall within the parameters of the state municipal bidding statute.
The law governing the award of municipal contracts remains largely unchanged, Nelson's Bus. Inc., supra. Municipal officials are not now and never have been "placed in a legalistic straitjacket." Gilbane, 107 R.I. 295, 302, 267 A.2d 396, 400. They must perform their duties "fairly and honestly and with reasonable exercise of sound discretion." Id. Public officials remain free to reject one or more bidders whose bid price is lower but who, in their honest evaluation under this very standard, is deemed unqualified to perform the work or whose bid is declared nonresponsive or who is not found to be a responsible contractor. The law mandates that bidders be evaluated on an even playing field on the basis of objective measurable criteria, § 45-55-5(2), and that a bidder whose bid meets this criteriaand is the lowest bid price shall be awarded the contract.
Public officials may permit bidders to correct honest mistakes in their bids, Gilbane, supra, but can now do so only to the extent permitted in regulations issued by the purchasing officer, § 45-55-5(6). Certainly municipal officials are free to reject lower bids when in the exercise of their discretion the bidder is deemed not to be qualified to perform the work. Hajian,supra.
Where a statute mandates the award of the contract to the "responsive and responsible bidder whose bid is the lowest . . . evaluated or responsive bid price, § 45-55-5(5), the contract may not be awarded to a higher bidder unless the lower bid is rejected or the bidder is found not to be responsible or not capable to perform the work. Funderburg Builders, Inc. v.Abbeville County Memorial Hospital, 467 F. Supp. 821 (D.S.C. 1979). Public officials simply cannot pick and choose among the bidders and decide who they like the best, who they think is superior, or who seems the most attractive.
The Project
The project consists of a new 11,000 square-foot auditorium, major renovations to the existing auditorium space, fourteen new classrooms, including new second-floor classrooms, language arts, faculty and administrative areas. Significant renovations to the cafeteria and kitchen areas, as well as rehabilitation of existing classrooms, are also included under the heading of major renovations, including ADA compliance work. Bathroom renovations and a new gym floor, some exterior site work, window replacement and roof repair are listed as minor renovations.
Under consideration is replacement of the existing steam boiler and improvements to the ventilation system. Finally, infrastructure site preparation for a new data technology system is planned.
Funding for this $11 million project has not been secured — the town plans a bond referendum in April. While an architect has been designated, no contract has been signed, no plans have been drawn and the proposed project is presently represented in conceptual drawings prepared by the architect. The School Committee has adopted an ambitious schedule. A bond referendum is planned for April 1, 1997, construction is scheduled to begin on June 23, 1997, and end on August 15, 1998.
As in most school renovation projects, construction is planned to continue during the 1997-98 academic year and the school will, of course, be occupied. This ambitious agenda already has been delayed because the School Committee postponed its decision from November 14, 1996, to December 19, 1996, in the face of controversy and doubt about the propriety of awarding this contract to a company other than the lowest qualified bidder.[1]
The Request for Proposal
Defendant Guida testified that he, as chairman of the Building Committee, drafted the RFP with input from the superintendent and principal. Guida was subsequently elected to the School Committee, which voted to award the contract to Gilbane. Guida testified he used a prior RFP issued by the School Committee in 1990 for construction management services performed by Gilbane for renovations to three elementary schools. This RFP was issued prior to the enactment of § 44-55-1, et. seq., the law governing municipal bidding, and is almost identical to the RFP in this case.
Guida testified he also used an RFP issued by the Town of Westerly in 1994 for construction management services for its high school. Gilbane was awarded that contract as well but was, in fact, the lowest qualified bidder.
Neither the 1990 Barrington RFP, the Westerly RFP, nor the 1996 RFP fully comply with § 44-55-5 of the General Laws which provide in part as follows:
 "45-55-5. Competitive sealed bidding. — (1) Contracts exceeding the amount provided by § 45-55-9 shall be awarded by competitive bidding unless it is determined in writing that this method is not practicable. Factors to be considered in determining whether competitive sealed bidding is practicable shall include whether:
 " (a) Specifications can be prepared that permit award on the basis of either the lowest qualified bid price or the lowest qualified evaluated bid price; and
 "(b) The available sources, the time and place of performance, and other relevant circumstances as are appropriate for the use of competitive sealed bidding.
 "(2) The invitation for bids shall state whether award shall be made on the basis of the lowest bid price or the lowest evaluated or responsive bid price. If the latter basis is used, the objective measurable criteria to be utilized shall be set forth in the invitation for bids, if available. (Emphasis supplied.)
 "* * *"
Neither invitation issued by Barrington either in 1990 or 1996 states the basis of the award of the bids. The Town and Gilbane insist, and the Court agrees, that this type of contract was not intended to be awarded on the basis of the lowest bid price. The Town insists this contract is to be awarded on the basis of the lowest evaluated or responsive bid price.
The RFP from the Town of Westerly is also silent on the basis of the award but included five objective and measurable criteria:
 " — References, prior experience in school construction (or related type construction) of similar scope and complexity as the Projects describe herein, and financial condition of the firm
 " — Project Staff (including identification of the Project Manager) and professional qualifications necessary for satisfactory performance of required services
 " — A record of community relations that demonstrates a sensitivity to the concerns of a wide variety of constituencies within the community
 " — Compliance with and responsiveness to the terms and conditions of the RFP (including acceptance of the proposed Contract)
 " — Cost of Construction Manager Services (including Fee)
 "The Town of Westerly reserves the right to select a CM who, in the Town's judgment, offers the highest potential for success and whose selection is in the best interest of The Town of Westerly."
In contrast, the criteria adopted by Barrington in this case predates the enactment of § 45-55-1 and is capable of subjective evaluation. It provides as follows:
"VII. SELECTION
Among the considerations to be utilized in selection of the Construction Manager for this Project will be:
 A. Demonstrated experience in the type of work required.
 B. Record of firm in accomplishing work on other, similar projects in required time frame.
 C. Quality of work performed previously by the firm for the Town of Barrington, if any.
 D. Professional background, experience and expertise of the principals and the potential Project Managers.
 E. Recent experience showing accuracy of cost estimates.
 F. Community relations, including evidence of sensitivity to citizen concerns.
 G. Familiarity and experience with a construction management team approach.
 H. Basic fees to be charged for the various categories of services.
 The Barrington School Committee reserves the unqualified right in its sole and absolute discretion to reject any and all proposals or parts thereof or to accept that proposal or those parts of any proposal which, in its sole and absolute judgment, will, under all circumstances, best serve the needs of the Barrington School Committee. The Barrington School Committee also reserves the right to negotiate the fees for the qualified prospects after the proposals have been submitted."
Both Collins and Dimeo allege that this criteria, as applied to these bids, is neither objective nor measurable against a standard communicated to all the bidders. The Court agrees. The parties were placed on an unequal playing field during the evaluation process undertaken in this case.
Plaintiffs also maintain the defendants, in an after-the-fact analysis (Ex. D), imposed their own subjective interpretation of that criteria in an effort to circumvent the competitive bid process and award the bid to Gilbane. The Court agrees. This analysis was developed after the Building Committee voted to recommend Gilbane.
Barrington insists the School Committee and the Building Committee applied these criteria objectively and evenly. Counsel for the School Committee suggested the Committee evaluated the bidders "using the eight criteria and decided that Gilbane, on the basis of all the eight criteria was the strongest candidate, the candidate they wanted to affiliate themselves to . . ."
However, Barrington concedes, and the Court specifically finds, the School Committee did not reject the lower bids nor did it find any of the lower bidders to be not responsible or not qualified to perform the work. Both Barrington and Gilbane maintain that the School Committee simply found Gilbane to be "superior" to the lower bidders and awarded it the contract on the basis of Gilbane's "superiority."
Counsel has belatedly attempted to place a different interpretation on the conduct of the School Committee. Counsel for the School Committee now suggests that since the School Committee did not affirmatively vote that plaintiffs were qualified, no inference can be drawn that they were. The Court flatly rejects this argument. Barrington cannot now suggest by inference that these bidders are not qualified when there is not a scentilla of evidence to support this suggestion and it flies in the face of the findings made by the Superintendent of Schools and the School Committee itself.
Competitive bidding statutes are enacted for the benefit of taxpayers and are designed to guard against favoritism, improvidence, extravagance and corruption through unfettered competition. Terminal Construction Corp. v. Atlantic CountySewerage Corporation, 341 A.2d 327 (N.J. 1975). Consequently, any bidding practice which "tends to favor one bidder over another or impairs the equal basis on which bids are computed cannot be tolerated . . ." Matter of Bayonne Park, Etc., 401 A.2d 705
(N.J. 1979).
 "When a statute requires that an award be made to the lowest (or highest) responsible bidder, it must be awarded accordingly unless that bidder is found not responsible, i.e., not qualified to perform the particular work under consideration." Boydston v. Napa Sanitation District, 222 Cal.App.3d 1338, 1339, 272 Cal.Rptr. 458, 462 (Cal-App. 6 Dist. 1990).
Although public bodies may possess wide discretion in determining which bidders are in fact responsible to perform this particular work, Hajian, "they may not, if they determine more than one bidder is responsible, make the award on the basis of relative superiority." Id. 272 Cal.Rptr. at 462; City ofInglewood-L.A. County Civic Center Authority v. Superior Court,7 Cal.3d 861, 103 Cal.Rptr. 689, 500 P.2d 601 (1972).
In 1992 the General Assembly enacted § 45-55-1 of the General Laws entitled "Award of Municipal Contracts." In §45-55-1 the Legislature specifically found that a "need exists to establish a uniform system for the award of contracts" by the cities and towns and mandated that the majority of these contracts be awarded on the basis of competitive sealed bidding.[2]
Awards must be made on the basis of the lowest qualified bid price or the lowest qualified evaluated bid price, §45-55-5(1)(a), and in the latter situation where considerations other than price are relevant and necessary, the criteria upon which the evaluation is to be made must be objectively measurable and "set forth in the invitation for bids," §45-55-5(2). All bidders must be allowed to compete on a level playing field and all must be bidding on substantially the same proposition. Cabro Construction Co. v. Middlesex CountyUtilities Authority, 558 A.2d 54 (N.J. 1989). The bids must be evaluated on an even basis against a measurable standard or they should be weighted on a point-system basis, Hajian Associates v.Board of Library Trustees/Building Committee, 685 A.2d 283 (R.I. 1996), so that all bidders clearly understand the importance attached to their answer. Public bidding documents cannot become take-home exams where extra credit is afforded for creative thinking. The law does not permit the arbitrary preference of one bidder over a lower, qualified bidder or, as in this case, more than one lower qualified bidder.
While it is clear that the standard of review of the conduct of municipal officials in awarding public contracts remains unchanged, Nelson's Bus, Inc. v. Town of Burrillville,639 A.2d 63 (R.I. 1994), and this Court must not substitute its judgment for that of the municipal officials, the inquiry does not end there. Cities and towns are now required to comply with state law in awarding contracts, including contracts for construction managers. The cornerstone of the statute firmly rests upon the lowest price; whether it is a flat-bid price or an evaluated bid, the award must be made to the lowest qualified bidder, and the criteria employed in making the award must be objectively applied to all bidders.
Moreover, bidders have an obligation to submit bids that are responsive to the specifications. These bids must comply with the requirements of the invitation in all material respects.
The contract in this case is for the services of a Construction Manager to work for the owner, Barrington School Committee, and to interact with the architect and the Building Committee during the design and estimating phase, preconstruction phase and construction phase of the project. This "team approach" includes the development of plans by the architect, value engineering by the Construction Manager who is expected to make suggestions to save both time and money and improve the overall result. The Construction Manager reduces the final plans and drawings to bid specifications, which are then advertised by the Construction Manager to trade contractors for competitive bids, again in accordance with the statute. Finally, the Construction Manager prepares a guaranteed maximum price for the project.
In rendering its award to Gilbane, the plaintiffs allege and the Court finds that the criteria contained in the RFP was interpreted by the School Committee in a subjective manner to the prejudice of the other bidders. Further, the Court finds that defendant Malafronte inappropriately expanded the criteria beyond that of the specifications, which unfairly favored the Gilbane proposal. The areas of greatest concern will be discussed separately.
Demonstrated experience in the type of work required
There is no question the type of work required is construction management for large construction projects. The project involves a high school with work to be carried out during the school year.
Each of the bidders clearly presented a comprehensive record of experience in this type of work. This fact was acknowledged by the Building Committee (Ex. D) and the School Committee at its December 19, 1996 meeting (Ex. 19). The Building Committee placed great emphasis on the fact that Gilbane had more experience. The superintendent expanded this interpretation to include the Town's "need" for a Construction Manager with national experience and certainly experience outside the New England area (which excludes Dimeo and Collins).
Nothing in the RFP or any of the other materials even remotely suggests that Construction Manager's experience outside New England is necessary, relevant or contemplated. Yet in his written summary (Ex. 12), oral presentation (Ex. 19), and testimony (Ex. 23 and trial) Malafronte emphasized Gilbane's "national reputation" and the fact that "his concern is to bring to the table a perspective beyond the New England area," which he then insists (Ex. 19) permeates the educational policy of the Town of Barrington, including its buildings (Ex. 19 at p. 39). Malafronte admitted the RFP was silent as to this consideration but continually insisted the Town needed a Construction Manager with experience outside New England. He virtually ignored the extensive experience of Dimeo, as did the School Committee, and gave no credence to the fact that Dimeo performed Construction Manager's services in educational institutions involving over $275 million in construction, including Bow High School in Bow New Hampshire. This was a $13 million project cited by local and state authorities for its integration of communications technology into a high-school facility. Likewise, the Committee virtually ignored Collins' extensive Construction Manager's experience in several schools in Rhode Island, including Lincoln, Providence, and Burrillville.
No references or recommendations were requested or contemplated. No research was performed.
Both the Building Committee and the School Committee acknowledged all bidders were experienced in occupied school buildings but the fact that Gilbane was more experienced and worked on a greater number of school projects was accorded great weight. At trial Chairman Guida acknowledged this:
 "[I]t became apparent that although we recognized that each of the four of the candidates were responsible construction firms, in the context of the eight criteria, it was clear to us that the Gilbane Building Company was superior in a number of the most important criteria that we were concerned about." (Tr. at 9)
Quality of work performed previously by the firm for theTown of Barrington, if any
The fact that Ahlborg, the highest bidder, performed work for Barrington over twenty-five years ago was disregarded as irrelevant. The Building Committee noted that neither Collins nor Dimeo performed any work for Barrington. Gilbane was Construction Manager for the elementary schools based on the identical 1990 RFP. At trial counsel for the School Committee suggested this criteria was included as a disqualifier and was intended to disqualify bidders whose prior work was unsatisfactory. This is not the case. While it is perfectly reasonable for municipal officials to accord weight to bids of contractors with whom they have had favorable experiences, the potential for favoritism in the application of this criteria in an unbridled fashion is great. Barrington was simply enamored with Gilbane and placed great emphasis on this factor.
The School Committee spent a great deal of time (Ex. 19) reviewing its pleasant experience with Gilbane and the Superintendent stressed the point. The Court finds this criteria was not objectively measured and unfairly prejudiced the other bidders.
Professional background, experience and expertiseof the potential Project Managers
The Building Committee noted that the personnel included in the Collins proposal "show substantial experience with a variety of construction projects other than schools." The Committee noted that the proposed estimator, Edward Hadfield, an estimator and project manager for twenty-five years, including college and secondary school construction (Ex. 5), "listed some limited K-12 experience" (Ex D).
The Building Committee noted that proposed Project Manager Mark J. Hashway has experience on a K-12 project, Burrillville Elementary, "which was a conversion from a nursing home rather than an addition and renovation of an existing occupied school" (Ex. D). The Committee accorded no weight to the fact that Mr. Hashway has a degree in Architectural Engineering with fourteen years' experience, including a $6.5 million addition and renovation of the existing Stonington High School; or a $1.7 million renovation of Warwick's Veterans High School, occupied, for noise and sound control. The School Committee was not even told about these qualifications. Defendant Malafronte, in his summary, accorded them no weight.
With respect to Dimeo, the Building Committee again acknowledged that the personnel listed by Dimeo "show substantial experience with a variety of construction projects" but found that most are not related to schools, "except at the university level," and this was accorded no weight. The Committee noted that Dimeo's major high-school project was the well-recognized Bow High School but failed to accord any weight to the fact that Craig Bolton, that project manager, will manage the job in Barrington. Defendant Malafronte minimized Dimeo's personnel because he had not had the opportunity to meet them (Ex. 19).
While the Building Committee was clearly impressed with the "Gilbane Project Team" (Ex. D), it was not nearly as effusive as either Malafronte or the School Committee (Ex. 19). The School Committee engaged in extensive discussion about Mr. Ray Pezzullo, an in-house consultant for infrastructure for technology. It appears that Gilbane emphasized its ability to provide an in-house consultant for communications technology. This was not part of the RFP, yet the defendants placed great weight on this person "even though it was something we had not put in" (Ex. 19, comments of School Committee member). Further, the Committee not only heavily weighed this in Gilbane's favor, it failed to afford the other bidders an opportunity to address this additional criteria. The Court finds the School Committee's subjective interpretation of this so-called technology coordinator to be so arbitrary as to be patently unfair and a palpable abuse of discretion. This factor was simply not in the bidding documents and the committee's heavy reliance on it resulted in real prejudice to the lower bidders.
Community Relations, including evidence of sensitivity tocitizen concerns
This criteria was transformed from community relations into a public relations and lobbying campaign designed to secure passage of the referendum. when viewed in its entirety, the conduct of the defendants with respect to this issue amounts to bad faith.
As noted above, the Building Committee, in developing its own proposal, utilized an RFP from the Town of Westerly. Gilbane was the Construction Manager on that job. Gilbane, and only Gilbane, included a bond referendum component in its bid and submitted the very materials they utilized in Westerly as an example of what they would do. This aspect of Gilbane's proposal became the cornerstone of the Committee's award. No other bidder was given the opportunity to address this issue, and it is simply not contained anywhere in the RFP. The bid specifications are silent with respect to a lobbying campaign and simply put, at least Dimeo stated — we're not lobbyists.
Section III of the RFP "Scope of Services" notes that prebond referendum services will be required on a pro bono basis, including "Support in presenting cost and logistic information to community groups." Each of the bidders acknowledged this section and indicated it was willing to provide that support. Gilbane proposed to do more, which is clearly appropriate. What is not appropriate in the fact that the defendants considered this offer in the context of the eight criteria knowing full well it came from Westerly to the exclusion and prejudice of the other bidders.
Malafronte specifically testified the School Committee was going with Gilbane so it would not have to engage the services of a public-relations consultant (Deposition at 39), because "Gilbane showed us what we should do" (Ex. 19 School Committee Meeting).
Familiarity and experience with a constructionmanagement team approach
The Building Committee found that Gilbane is the fifth largest construction management company in the United States and would bring extensive experience to the project. The Building Committee assumed, from the seven experiences listed as construction manager, that Collins was familiar with the process but faulted Collins for not explaining how that experience would translate into Barrington's benefit. Nothing in the RFP requested this analogy. The Building Committee summarily concluded Dimeo was familiar with the process but not as experienced as Gilbane.
Defendant Malafronte again emphasized Gilbane's national experience. Malafronte concluded that since the Gilbane "team" had more experience it was simply "more qualified" (Ex. 19), especially with its nationwide experience. Again, nothing in the RFP calls for a bidder to possess nationwide experience. The Court finds this reasoning to be particularly arbitrary when viewed in light of Dimeo's response. Clearly, a fair reading of both proposals would place these bidders on an equal basis. Further, the School Committee acted arbitrarily in its evaluation of Collins's experience with the construction management team approach. It clearly found that Collins met this criteria but unfairly faulted Collins because it did not analogize this qualification to Barrington's benefit and, more critically, it did not afford Collins an opportunity to do so. These discretionary abuses are plainly established by the evidence in this case and are knowable and palpable.
Basic fee to be charged for the various categories of services
The Building Committee placed little emphasis on fees; the members acknowledged Gilbane was higher than Collins and Dimeo; noted that Gilbane did not include costs for the bonds and insurance and voted to recommend Gilbane "as the most attractive candidate." Dimeo and Collins both liken this analysis to a beauty contest, that is, who do you like the best, notwithstanding the cost.
The School Committee carried this abuse one step further. Malafronte clearly favored Gilbane throughout the entire School Committee meeting:
 "In summary I would have to say although Gilbane is higher, the experience and services offered warrant the additional expenditure, particularly in the areas of technology, community relations and sensitivity and experience."
Malafronte rested his entire recommendation on matters outside the scope of the RFP, namely, national experience, the so-called technology coordinator, the public relations and lobbying campaign and the fact that Gilbane was a bigger company. This was done without regard to the other bidders and without rejecting the other bidders or declaring them to be not qualified. This conduct is glaringly transparent, unfair, arbitrary and an abuse of discretion and in violation of § 45-55-5(5) which mandates:
 "(5) The contract shall be awarded with reasonable promptness by written notice to the responsive and responsible bidder whose bid is either the lowest bid price, or the lowest evaluated or responsive bid price."
The municipal defendants in this case simply decided they liked Gilbane and awarded it the contract — an after-the-fact analysis (Ex. D) was prepared "summarizing" the actions of the School Building Committee. Defendant Malafronte and the School Committee then proceeded to subjectively manipulate the selection criteria to the exclusion of the two lower bidders. The Court finds the School Committee failed to award the contract to the lowest responsive and responsible bidder whose bid is the lowest evaluated or responsive bid price. That bidder is clearly Collins. Barrington awarded the contract to the third highest bidder in clear violation of state law. This is simply not allowed.
The Barrington Town Charter
Section 16-2-9 of the Barrington Town Charter entitled "Purchasing Practices" provides in relevant part as follows:
 "16-2-9 PURCHASING PRACTICES. The Town Manager, and in the case of the School Department the Superintendent of Schools, shall be responsible for the purchase and sale of all materials, supplies, equipment and public improvements in accordance with the following requirements:
 "* * *
 "d. Purchase shall be made from the lowest competent bidder meeting specifications unless the Council or the School Committee shall determine that the public interest will be better served accepting a higher bid. In such case, the Council or the School Committee shall set forth its reasons therefor. The acceptance of any bid shall be conclusive upon all bidding parties that the same was accepted in accordance with the provisions of this section."
There is no question the members of the School Committee were fully aware of this section and, in fact, in the form of a motion set forth their reasons for the award to Gilbane. Counsel for the School Committee asserts that this section can be read consistently with state law, but to the extent these sections conflict he suggests the Charter controls. It is unnecessary to venture into the area of whether or not the Barrington Town Charter supercedes state law, a dubious assertion indeed, because § 16-2-9 can be read consistently with state law. Simply put, the School Committee must set forth its reasons for accepting a higher bid and that reasoning must reflect good faith, fair dealings and an exercise of reasonably sound judgment. Goldman,supra; Gilbane, supra. The standard of conduct has remained the same. Nelson's Bus. Inc., supra. Section 16-9-2 of the Town Charter contemplates a review of that reasoning by the bidding authority; it is not a blank check designed to make the competitive bidding process a nullity.
At the December 19, 1996 meeting of the School Committee, the chairman stated:
 "Moving forward, before we take the vote, if the committee is interested in awarding the contract to someone other than H.V. Collins, I will entertain a resolution in, in (sic) the public interest to award the construction manager (contract) to a contractor other than the lowest bidder . . ."
 A member thereupon made the following motion:
 ". . . that it is in the public interest to award the construction manager contract to other than the lowest bidder on the basis of the eight criteria set forth in the RFP, only one of those is the bid price. The School Committee, as evidenced by our discussion tonight has given great weight to the experience in high school construction, the experience of quality of work performed for the Barrington School Department, the professional background and experience of the (proposed) project staff. . . . and the proposed approach to assisting the School Committee in presenting and gaining passage of the bond referendum for this project and just general experience as a construction manager."
This analysis involves the very same subjective and manipulative interpretation of selection criteria which were not included in the RFP. Applying the same standard of conduct asGoldman, Gilbane, and Nelson's Bus, the Court finds this award is so arbitrary as to amount to a palpable abuse of discretion. Neither the Town Charter nor state law permits the School Committee to circumvent the competitive bidding process to award a competitive bid because they think the third-highest bidder is superior or better. This is clearly not in the public interest and violates § 16-9-2 of the Barrington Town Charter.
The Nonresponsiveness of the Gilbane Bid
Both Collins and Dimeo maintain that Gilbane's bid did not comply with the requirements of the bidding proposal in several material respects, is therefore not a responsive bid pursuant to § 45-55-5(5), and should be rejected.
Clearly, § 45-55-5(5) requires a bidder to be both responsible and to submit a responsive bid, that is, a bid which satisfied "the advertised specifications." Goldman, 283 A.2d at 675. A responsible bidder is one who is found to be trustworthy, reliable, financially sound and otherwise fit to perform the work. City of Inglewood-Los Angeles County Civic Center Authorityv. Superior Court, supra. A "responsible bidder" is one who is "capable financially and competent to complete the job for which he is bidding . one who is possessed of a judgment, skill, ability, capacity and integrity . . . to perform a public contract according to its terms." Black's Law Dictionary, 1312 (6th ed. 1990). The term "responsive" relates to the bid, not the bidder, and is defined as "constituting or comprising a complete answer. Black's Law Dictionary, 1312 (6th ed. 1990).
A bid which fails to comply with the material requirements of the bidding documents or fails to include required submittals is a nonresponsive bid.
 "It is a general rule that the bid of one proposing to contract for the doing of a public work must, in order to secure the contract, respond or conform substantially to the advertised terms, plans and specifications . . .; otherwise, the board or official whose duty it is to award the contract may properly refuse to give the bid consideration. Indeed, it is the duty of the public authorities to reject all bids which do not conform substantially with the terms of the proposal, for any other rule would destroy free competition." (Emphasis supplied.) 64 Am.Jur. 2nd, Public Works and Contracts § 57.
The grounds upon which a bid may be rejected are "that it is not accompanied by the required bid security or any other required data; that it is incomplete or irregular. FunderburgBuilders. Inc. v. Abbeville County Memorial Hospital, 467 F. Supp. 821 (D.S.C. 1979); Chris Berg, Inc. v. State, Dept. ofTransportation, 680 P.2d 93 (Alaska, 1984).
Certainly public officials in Rhode Island have always had the discretion to reject any bid proposal which does not respond to the specification, Truk Away of R.I. v. Macera Bros.,643 A.2d 811 (R.I. 1994), and may allow bidders to correct errors in their bids, particularly where the error was not made as a result of the bidder's negligence. Gilbane, but see § 45-55-5(6). The Court is aware of no case where the decision of a municipality to reject a bid as nonresponsive has been successfully challenged. The question presented here is somewhat apostate, particularly in light of § 45-55-5(6) which mandates that the bid be responsive. Under what circumstances are municipal officials obliged to reject a bid because it fails to respond to the bid specifications?
There are some jurisdictions which by statute or regulation mandate the rejection of bids which fail to meet certain bid specifications, particularly in the area of a bid bond or bid guarantee, Professional Building Concepts, Inc., v. City ofCentral Falls, 783 F. Supp. 1558 (D.R.I. 1992), and do not permit the bid to be corrected or supplemented after the bid opening.Id.
The purpose behind the requirement that bids must be responsive is to secure competition and to guard against favoritism. This requirement furthers the goal of a uniform system for the award of public contracts (§ 45-55-1); and thus these conditions of eligibility must apply equally to all bidders. Ace-Manzo v. Township of Neptune, 258 N.J. Super. 129,609 A.2d 112 (N.J. Super. 1992).
The rejection of a bid is an affirmative act of exclusion by a public body and not to be confused with the mere nonacceptance of a bid which results from the acceptance of some other bid. 64 Am.Jur.2d "Public Works and Contracts" § 75. Municipal officials have a duty to determine the responsiveness of a bid at or near the time of the bid opening consistent with their duty to act fairly, reasonably, and to exercise reasonable discretion.Goldman, supra; Truk Away of R.I., supra.
This exercise affords the public body the opportunity to decide whether a defect or omission is material and nonwaivable or whether the omission is a mere informality or defect in the form of the bid, not affecting its competitive character. The test of whether a bid condition is material and nonwaivable has been described in other jurisdictions as follows:
 "There must, therefore, be applied two criteria in determining whether a specific noncompliance constitutes a substantial and hence nonwaivable irregularity — first, whether the effect of a waiver would be to deprive the municipality of its assurance that the contract would be entered into, performed and guaranteed according to its specified requirements, and second, whether it is of such a nature that its waiver would adversely affect competitive bidding by placing a bidder in a position of advantage over other bidders or by otherwise undermining the necessary common standard of competition." Ace-Manzo, supra, 609 A.2d 112, 115 quoting Tp. of River Vale v. R.J. Longo Construction Co., 127 N.J. Super. at 216, 316 A.2d 737; See Hillside Tp. v. Sternin, supra;
10 McQuillin, Municipal corporations (1966 ed.) 29.65 at 397.
The price of the Gilbane bid did not include costs for the performance bond, payment bond and liability insurance. These costs are significant. Gilbane also did not include the cost of the building permit which the parties have agreed is $32,500. Attachment 2 of the RFP requires the bidders to include these costs in their proposal. Gilbane failed to include these amounts which, if included, would have increased its bid price even higher.
The facts demonstrated that the School Committee overlooked these omissions and adjusted the other bids downward by reducing the cost of each bid to the extent it included costs for the bonds and liability insurance. Malafronte then assumed the cost of the building permit was minimal (a few thousand) and made no adjustment for that expense. This is clearly arbitrary conduct.
In its proposal Gilbane suggested the School Committee "waive the bond as it was on the previous project" and said nothing about a rider on the Town's own liability policy.
The defendant School Committee never voted to waive the requirement of the payment and performance bonds as to any bidder, including Gilbane. Indeed, Guida testified the financial disclosures of the other bidders were not complete enough for the School Committee to make this determination.
Conditions requiring detailed descriptions of materials or "decreases in price if alternate products are to be used . . . or the delivery of a certificate demonstrating a present ability to perform" are considered to be material and not subject to waiver. Terminal Const. Corp., supra, 341 A.2d at 331. Bond and insurance requirements of a competitive bid, particularly where mandated by state law, are generally not thought to be subject to a waiver by the awarding authority. Carpet City, Inc. v.Stillwater Municipal Hospital, 536 P.2d 335 (OKL. 1975).
Where the defect is found not to be material, it can be waived. However, § 45-55-5(6) provides that the bid may be corrected only to the extent permitted by regulations issued by the purchasing officer. The Court has been supplied with no regulations issued by Barrington.
The School Committee clearly reserved the right to reject any and all proposals "or parts thereof or to accept that proposal or those parts of any proposal. . ." This provision carries little weight in the area of mandatory and material requirements of a bid except to the extent the bid may be rejected. In that case, the reservation of a right to reject any bid is generally given effect. Goldman; Hajian. However, this provision cannot be read as giving rise to the unqualified right to overlook material defects in the bid, Ace-Manzo, supra, or vest the awarding authority with unbridled discretion to reject all of the other bids. Id. Bodies By Lembo v. Middlesex County, 669 A.2d 254 (N.J. Super. A.D. 1996); Kenneth E. Curran v. Auclair Transportation,Inc., 431 A.2d 124 (N.H. 1981).
Both Collins and Dimeo allege that Gilbane's bid was nonresponsive in several respects in that Gilbane failed to include:
 "A. The cost of the payment and performance bonds and liability insurance and building permit as required by the RFP.
 "B. Evidence that it will be able to supply a performance and payment bond.
 "C. A cash flow chart as required by § III(6)."
 These omissions will be considered separately.
A. The cost of the payment and performance bonds and liabilityinsurance and building permit as required by the RFP.
The actual cost savings associated with purchasing a rider on the Town's listing liability insurance policy was never determined. These omissions materially and substantially affect the bid and the bid price. Initially there exists real doubt about the ability of the School Committee to waive the performance and payment bonds. (See, infra.) Secondly, it is impossible to determine how much this award to Gilbane will actually cost the taxpayers. While Gilbane's price may remain fixed at $714,750, the additional cost to the Town for the insurance rider and lingering questions surrounding the bonds leave the cost of the contract entirely to speculation. These are additional costs to the taxpayers not readily ascertainable from the bid.
Where deviations from the advertised specifications and the bid affect the price of the contract, prejudice the other bidders, and limit or destroy competitive bidding, they are material and are not subject to waiver by the awarding authority.Coleman ex rel.; State v. Munger, 84 Ohio App. 148, 83 N.E.2d 809
(1948). Other bidders are not required to show that the waiver of a defect in a competitor's bid gives rise to an actual competitive advantage; the fact that a waiver of a condition required to be submitted is likely to affect established standards of competition is all that is necessary. Cubic WesternData v. New Jersey Turnpike Authority, 468 F. Supp. 59 (D.N.J. 1978).
Here the failure to include costs associated with bonds increases the cost of the contract to Barrington and creates a wider disparity in the bids. This adversely affects competition, particularly where it will only apply to Gilbane. "Every element which enters into the competitive scheme should be required for all and should not be left to the volition of the individual aspirant to follow or to disregard and thus to estimate his bid on a basis different from that afforded the other contenders."Bodies by Lembo v. Middlesex County, supra, 669 A.2d at 257.
Barrington's response is somewhat disingenuous. Defendant Guida points to portions of the RFP which invite suggestions which may save the Town money and relies on these sections to excuse Gilbane's failure to include these costs. Guida testified he considered this to be a plus in Gilbane's favor. This argument is without merit. Attachment 2 of the RFP reads:
 "The following construction and professional services to accomplish the General Program delineated in the RGB Documents are to be included, but not limited to the categories listed. Any services not specifically noted which you consider appropriate are to be included in your proposed price and should be so noted in your proposal. Furthermore, any services specifically mentioned which you consider unnecessary or inappropriate for this Project should also be specifically noted in the space provided."
The fact that the RFP requests bidders to note "in the space provided" any services specifically mentioned which are considered unnecessary or inappropriate does not excuse this omission. The Court finds that liability insurance and performance and payment bonds are not services provided by a construction manager but rather serve as protection for the taxpayers who are funding the project and the vendors. The failure to include these costs will affect the price of the proposal.
Advertised conditions whose waiver is capable or likely to affect the amount of the bid, or is capable of becoming a vehicle for favoritism, are material conditions in a bidding specification and may not be waived. Terminal Const. Corp. v.Atlantic County Sewer Auth., 341 A.2d 327 (N.J. 1975). To allow subsequent adjustments to a contractor's bid, particularly where there is no readily ascertainable amount with which the adjustment can be made, i.e., the liability insurance and building permit, frustrates the purpose of competitive bidding.Coleman ex rel.; State v. Munger; 84 Ohio App. 148, 83 N.E.2d 809
(1948); E. M. Watkins Co. v. Board of Regents, Fla. App.,414 So.2d 583 (Fla. App. 1982).
Further, the suggestion by Gilbane that Barrington waive the performance and payment bonds is without statutory support. Plaintiffs direct the Court to R.I.G.L. § 37-13-14 which provides:
 "37-13-14. Contractor's bond. — (a) The state or any city, town, agency, or committee therein awarding contracts for public works shall require the contractor awarded a contract with a contract price in excess of five thousand dollars ($5,000) for public works to file with the proper authority good and sufficient bond with surety furnished by any surety company authorized to do business in the state, conditioned upon the faithful performance of the contract and upon the payment for labor performed and material furnished in connection therewith, such bond to contain the terms and conditions set forth in chapter 12 of this title, and to be subject to the provisions of that chapter."
Gilbane relies on Accent Store Design. Inc. v. MarathonHouse, Inc., 674 A.2d 1223 (R.I. 1996), as authority for its position that performance and payment bonds are not required by state law and that Barrington could (at least with respect to Gilbane) waive these requirements. This reliance is misplaced. InAccent Store Designs, supra, the Supreme Court refused to recognize a cause of action available against public officials who fail to require a bond on public works projects. 674 A.2d at 1226. The question of whether a municipality can waive a performance and payment bond was not addressed and remains doubtful, especially where the funds for the project are derived from the issuance of long-term bonds by the Town of Barrington. The holding in Accent Designs does not render this requirement in the bid to be a mere formality. These costs go directly to the price of the contract and the actual dollar costs of these items to the taxpayers. The Court finds the omission of these costs to be a material defect which renders the bid nonresponsive.
B. Evidence that it will be able to supply a performance andpayment bond.
Both Collins and Dimeo submitted commitments from attorneys-in-fact clearly evidencing their ability to supply a performance and payment bond. Gilbane did not. Gilbane reminded the defendants of its sound financial position, stated it has been bonded extensively in the past and submitted a letter from Aetna Casualty and Surety recommending Gilbane as an outstandingconstruction manager. The author, David J. Byrne III, stated that Aetna has executed performance and payment bonds in the past. This is not "evidence" that Gilbane will be able to supply a performance bond in this case, especially since the bidders were reminded by Malafronte in a separate letter (Ex. 2) that the performance bond should cover both construction management services and the guaranteed maximum price for the entire project (Ex. 2). The Court finds this is a material, mandatory aspect of the bidding proposal, is required by law to be a part of the contract, § 37-13-14, and its omission may not be waived. Thus the failure of Gilbane to comply with this requirement in reliance on the Town undertaking a questionable waiver renders its bid nonresponsive.
Gilbane's response was that no bond was required of Gilbane
because of its financial strength and all the parties understood this. While Barrington may have been willing to overlook this requirement it never voted to do so, and this very suggestion has the effect of placing the Gilbane bid above the others. The fact the bonds may be waived does not excuse Gilbane from complying with the mandatory conditions of the RFP which provide:
 "V Submittal
 "(L) Each proposer is required to show evidence that it will be able to supply the Barrington School Committee with a Performance Bond and/or Labor Material Bond, if required. In the event the GMP option is not selected, the bidders are to be alerted that individual contractors may be required to supply said Bonds in connection with their portion of the work."
This is a mandatory requirement of the submittal, is material, and its exclusion, renders the bid nonresponsive. Any waiver of this requirement with respect to Gilbane, and Gilbane alone, is a clear abuse of discretion, smacks of favoritism, and violates the principles of competitive bidding.
C. A cash flow analysis and phasing schedule. Section III(6) of the RFP entitled Scope of Service requires the following submittal:
 "(6) Your proposed terms of payment along with a detailed chart showing the estimated cash flow by month must be included in your proposal . . ."
Both Collins and Dimeo provided separate proposed terms of payment and a detailed cash-flow analysis. Gilbane did not. Guida testified he informed Gilbane's representative of this omission and received a cash-flow analysis after the bids were opened. He did not, however, forward this to the School Committee. Guida testified that the Building Committee made note of Gilbane's failure to include a cash-flow analysis in its report to the School Committee (Ex. D). However, no member of the awarding authority ever decided, one way or the other, whether or not this cash-flow analysis was a material requirement of the proposal. Guida testified this issue was not raised by the other bidders. (Tr. 19-20). It is not the duty of the other bidders to determine the responsiveness of the opposing bids. This duty rests with the awarding authority and when, as here, a requirement is not met, or a submittal is not included, and this fact is known to the awarding authority, i.e., Guida, it cannot be summarily dismissed or ignored. While this may be the type of formal defect which is capable of a valid waiver by the awarding authority in the exercise of its sound discretion, it did not happen here. This is evidence of a palpable abuse of discretion and is plainly unfair to the other bidders who have complied with all of the requirements of the specification.
The manner in which this omission was handled by defendant Guida and the Building Committee suggests this requirement of the RFP was more than a mere irregularity or error in form. The fact that Guida, the chairman of the Building Committee, informed Gilbane there was no cash-flow analysis included in its bid, later received a cash-flow analysis but did not forward it to the committee, gives rise to an inference there was a problem with the bid which Guida, to his credit, did not allow Gilbane to correct, § 45-55-5(6). It leads to the conclusion, however, that this submittal was considered more than a mere formality or defect in form.
Conclusion
In light of the findings of fact and conclusions of law made by the Court, the Court finds that plaintiffs have sustained their burden of proof. The Court issues a declaratory judgment that
 (1) H.V. Collins submitted the lowest competent and responsible bid with the lowest evaluated and responsive bid price.
 (2) Plaintiff Intervenor Dimeo Construction Company is the next lowest competent and responsible bidder with the next lowest evaluated and responsive bid price.
 (3) Defendant Intervenor Gilbane Building Company is not the bidder whose bid is the lowest evaluated or responsive bid price.
 (4) Defendant Intervenor Gilbane Building Company's bid is nonresponsive in several material respects, is fatally defective and should have been rejected by the Barrington School Committee.
 (5) The evaluation of the bids by the Barrington School Committee was subjective, unfair, and included matters outside the criteria of the bidding document.
 (6) This conduct is in violation of § 45-55-5
of the General Laws and § 16-2-9 of the Barrington Town Charter.
 (7) The Court finds the evidence in this case to be clear and compelling, and with due deference to the standard of proof and mindful of the ringing admonition of the Supreme Court to exercise great care the Court finds and declares that the conduct of the School Committee, in its application and arbitrary interpretation of the selection criteria, is so unreasonable and patently unfair as to amount to a palpable abuse of discretion.
 (8) The Court also finds that the use of the Westerly RFP and the School Committee's heavy reliance on the very pro bono public relations and lobbying campaign utilized by Westerly and suggested by Gilbane, without affording the other bidders any opportunity to respond to this criteria, amounts to bad faith.
Counsel for the plaintiffs shall have five (5) days from the date of this decision to prepare an order consistent with the Court's findings herein.
[1] Exhibit 18b — the minutes of the School Committee Meeting of November 21, 1996, indicate the Committee voted to defer voting on the contract until legal counsel was able to research the issue of the validity of an award to a party other than the lowest responsible bidder, particularly in the face of the problems with the Gilbane bid. At the meeting of December 5, 1996, legal counsel suggested the Town seek a declaratory judgment regarding awarding the contract to Gilbane.
[2] Section 45-55-6-competitive negotiations and §45-55-7-noncompetitive negotiations are available in limited circumstances and have no relevance here.