[No. G044596. Fourth Dist., Div. Three. June 7, 2011.]

ADVANCED REAL ESTATE SERVICES, INC., et al., Petitioners, v. THE SUPERIOR COURT OF ORANGE COUNTY, Respondent; DEPARTMENT OF GENERAL SERVICES et al., Real Parties in Interest.

COUNSEL

Greenberg Traurig, Gene G. Livingston, Jeremy A. Meier, Marc B. Koenigsberg; AlvaradroSmith, Ruben Smith, Thierry Montoya; Aitken Aitken Cohn, Wylie A. Aitken and Ashleigh E. Aitken for Petitioners.

No appearance for Respondent.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Douglas J. Woods, Assistant Attorney General, Stephen P. Acquisto and Michael Glenn Witmer, Deputy Attorneys General, for Real Party in Interest Department of General Services.

Allen Matkins Leck Gamble Mallory & Natsis, Thomas E. Gibbs, Stephen R. Thames and Nicholas S. Shantar for Real Parties in Interest Facilities Management West, Inc., and OC Fair and Event Center, L.P.

OPINION

**RYLAARSDAM, Acting P. J.—**

INTRODUCTION

In 2009 the Legislature passed section 3884.2 of the Food and Agricultural Code providing for the sale of the Orange County Fairgrounds (the

Fairgrounds). In November 2010, the executive branch Department of General Services (the Department) accepted the bid of Facilities Management West, Inc. (Facilities Management), to buy the Fairgrounds for $100 million, consisting of $20 million down, with the remaining $80 million to be paid off over the course of 35 years.

A disparate group consisting of rival bidders, friends of the Orange County Fair, a state senator, an Assemblymember, and a Costa Mesa council member brought this suit to stop the sale. The trial court issued a temporary restraining order on November 17, 2010, precluding any further action on the part of the Department to consummate the sale of the Fairgrounds. However, the trial court ordered the temporary restraining order lifted on December 21, which would have allowed the sale to go through. On that day, in response to a petition for a writ of supersedeas from the opponents of the sale, this court stepped in and issued a stay, stopping the sale from going forward until we could consider the issues raised.

■ Having heard oral argument and having considered the issues, we now grant the requested writ of supersedeas. In a word, *this* sale cannot go forward. There are two main reasons.

First, the Legislature required the Department to provide the Legislature with an explicit comparison between the Fairgrounds's fair market value and any deal which the Department proposed to make. (Food & Agr. Code, § 3884.2, subd. (d)(2) & (3); all undesignated statutory references in this opinion are to that code.) The Department, however, neglected to provide that comparison. Indeed, the Department's claim that the deal it made automatically equaled the fair market value of the property contradicted the position it had taken only a few months earlier in a previous round of bidding. In that round, the Department apparently had a good idea of the fair market value of the property, and decided that none of the bids it had received had come sufficiently close to be accepted.

Second, the bidding process itself was flawed by the total absence of any bid protest procedures. In section 3884.2, subdivision (c) the Legislature had required the sale of the Fairgrounds be "pursuant to a public bidding process *designed* to obtain the highest, most certain return for the state from a *responsible* bidder." (Italics added.) Here, however, the Department implemented a bidding system that contained no safeguards to ensure responsibility, or even that bids be materially responsive to the Department's own request for proposals.

These two flaws in the procedure by which Facilities Management was awarded the sale—particularly the failure to provide the Legislature a comparison between the fair market value of the property and the terms actually

proposed by the winning bidder—mean that the proposed sale cannot be consummated. While the second flaw (the absence of a bid protest mechanism) might, in theory, be cured by simply sending the matter back to the Department to allow for administrative challenges to the bids received, the first flaw (failure to give the Legislature the comparison *it* wanted) is necessarily fatal. The Legislature reserved for itself the opportunity to veto the sale if *it* was not satisfied with the terms of the sale in comparison with the fair market value of the Fairgrounds. It never got that opportunity.

We therefore grant the requested writ of supersedeas. In practical terms, the result of our decision is to void the proposed sale and require the Department to start all over again, if the Governor so chooses.

## FACTS

### 1. *The 2009 Legislation*

In 2009 the Legislature passed, and then Governor Schwarzenegger signed, Assembly Bill No. 4X 22 (2009–2010 4th Ex. Sess.), which provides for the sale of certain items of real estate owned by the State of California, with the proceeds to end up in the state's general fund. One of the items of real estate to be sold is the land currently being used as the Orange County Fairgrounds.

Assembly Bill No. 4X 22 (2009–2010 4th Ex. Sess.) added several new statutes to both the Government Code and the Food and Agricultural Code. The provisions specifically covering the Fairgrounds were new sections 3884.1 and 3884.2 to the Food and Agricultural Code. Subdivision (c) of section 3884.2 directs the Department to conduct the sale of the Fairgrounds "pursuant to a public bidding process designed to obtain the highest, most certain return for the state from a responsible bidder."

### 2. *The Bidding*

#### a. *The first request for proposals*

An initial request for proposal was issued by the Department in September 2009 and provided for a public auction *after* bids were opened. Facilities Management was the high bidder at $55 million, but, in the auction held in January 2010, another firm, Craig Real Estate, presented the highest bid at $56.5 million. However, in March, the Department rejected the $56.5 million bid as being, in the words of one of its senior real estate officers, "not the highest and most certain return," i.e., too low.

One should bookmark that fact: The Department at the time obviously had a good idea of the Fairground's fair market value independent of whatever bid happened to be the highest.

b. *A possible private deal*

So, in the spring of 2010, the City of Costa Mesa began efforts to put its own deal together. Those efforts resulted in a proposed three-way deal between Facilities Management, the Department, and a joint powers authority controlled by the City of Costa Mesa. Facilities Management would provide the money and obtain a long-term lease on the property from the joint powers authority: The price was $96 million, and the deal provided for a minimum downpayment of $19.2 million, a promissory note for the balance, installment payments not to exceed 40 years, a fixed payment schedule for those installments, sale of the property "as is," and (though this would go without saying given the private nature of the deal) no auction. However, since the transaction was obviously being concluded without a public bidding process as required by section 3884.2, the agreement also recognized that the Legislature would need to enact further legislation.

c. *The second request for proposals*

The Legislature did not take any action on the privately negotiated sale, so in August 2010 the Department issued a second request for proposals. The salient points of the Department's request for proposals are these: The Department reserved the power not to accept any bid. Unlike the first request, there would be no auction after the bidding. The bid deadline was September 30. The final selection would be made October 14. The Legislature was to receive notice within the week, i.e., by October 21. The minimum terms were: A downpayment of $20 million and any installment payments were not to exceed 40 years pursuant to a fixed payment schedule (so, for example, a bidder could not vary its payments depending on how much money the property was earning). Also, the net present value of any stream of installment payments was to be equal to the face value of any promissory note given by the bidder, using a discount rate of 6 percent. And there was to be no contingent financing. The second request also required information about the "responsibility and strength of each financial principal" of each bidder.

The timeline set forth by the second request for proposals is also worth noting: The request itself was issued August 23, 2010. Bidders could ask questions up to September 9, and would receive responses to those questions postmarked no later than September 20. The final bid submission date was September 30. The final selection and notice to bidders was to be sent out October 14. The successful bidder's "execution of purchase contract" was to be a week later, on October 21. And on that date notice was to be given to the Legislature. For its part the Department itself was scheduled to execute the contract one month later, on November 22, which would be the date escrow would be opened. Escrow was to close "December 2010."

An addendum to the second request changed a few dates in this timeline— basically hurrying things up: Instead of the Department's final selection being made on October 21, the date was moved up to October 19. And instead of escrow being opened on November 22, it was moved up more than a month to October 20. Also, the Department's own execution of the contract was moved up from the original November 22 to November 18. Escrow was still to close "December 2010." Likewise the buyer's execution, originally slated to be November 22, was moved *up* to November 15.

### d. *The bids on the second request*

Bids were received from four entities: American Fairs and Festivals ($97 million), Advanced Real Estate Services, Inc. ($100 million), Facilities Management ($100 million), and City Ventures ($98 million). Each of the four bids consisted of a $20 million downpayment, but proposed somewhat different terms for the balance to be paid via a promissory note. We may skip detailing the losing bids of American Fairs and City Ventures, as those bids would not figure significantly in the course of the litigation to come.

We do note, however, some differences in the two bids proffered by Advanced Real Estate and Facilities Management. Advanced Real Estate proposed to give a $100 million note, not an $80 million one as proposed by Facilities Management. (We recognize the anomaly that with a $20 million downpayment, the purchase price was still ostensibly $100 million, not $120 million.) Advanced Real Estate's note was to be for 40 years, while Facilities Management's note was for 35 years. And Advanced Real Estate's schedule of payments was different: Advanced Real Estate proposed to give itself eight years of zero payments, while Facilities Management proposed only one year.

On the other hand, Advanced Real Estate proposed to pay significantly more beginning in year nine ($1.6 million), with payments then to steeply rise until it would be paying $9.6 million per year in years 31 through 40. By contrast, Facilities Management's bid contemplated payments of $6.8 million in years five through 10, and payments of about $7.3 million for the rest of the 35-year note. Facilities Management's offer had no balloon payment at the end of the 35-year term of the note, while Advanced Real Estate's note would require a balloon payment, after the 40-year term of the note, of $505 million. (And that is no typo. Advanced Real Estate would owe the state more than a half a billion dollars at the end of the term.)

Despite the longer term of Advanced Real Estate's note, and its balloon payment, a summary and analysis prepared in October 2010 by the Department itself concluded that the "net present value" (using a 6 percent interest rate) of Advanced Real Estate's offer was $20 million *more* than the

net present value of Facilities Management's offer. In specific terms, the Department assigned a net present value of $100 million to Advanced Real Estate's offer, and assigned a net present value of $80 million to Facilities Management's offer.

### e. *No bid challenges allowed*

Attorneys for parties who would later challenge the sale in court (including Advanced Real Estate) submitted two letters protesting the bid process as it was being conducted by the Department. The first letter was sent September 28, 2010, and made the point that the second request for proposal violated section 10339 of the Public Contract Code by containing "material key terms" that were the same or nearly the same as those contained in the deal privately negotiated in the spring between Facilities Management and the Department. The letter drew a response on October 20 (the day *after* the final selection under the revised timeline), asserting that the Department "does not legally possess the jurisdiction to hear protests in connection with sale of real property pursuant to Food and Agricultural Code section 3884.2."

The second letter was sent October 22, 2010, directly protesting the award to Facilities Management just days before. The letter was short, and made general legal arguments: The Department had not complied with applicable law or its own request for proposals, and had discriminated against other bidders.

This second letter drew a response on October 29, substantively identical to the Department's response to the earlier protest letter, including the assertion of no jurisdiction to hear bid protests and the unctuous tagline, "Your interest in the business transactions of the State of California is appreciated, and it is hoped that you will be successful in future dealings with the State."

### 3. *Selection and Notification to the Legislature*

*Despite* the higher net present value of Advanced Real Estate's bid—but clearly *because* of the large balloon payment proposed at the end of the 40-year term of its note—the Department chose Facilities Management's offer. What the senior real estate analyst in the Department thought most dispositive was that the risk of default on Advanced Real Estate's obligation would seriously increase along with the dramatic increase in the balance of the loan during its term. That would not be the case with Facilities Management's bid, which would be all paid off by the end of 35 years.

On October 19, the date of the final selection according to the revised timeline, the Department sent Denise Moreno Ducheny, chairperson of the

Joint Legislative Budget Committee, a short letter describing the acceptance of the bid of Facilities Management. The cover letter included an "attachment A" giving the terms and conditions of Facilities management's proposal (in a word, a purchase price of $100 million with a downpayment of $20 million, the balance to be repaid back in 35 years, interest at 6 percent).

But what *was not* in the notice was a comparison of fair market value with the terms submitted by Facilities Management. The total language on the topic of fair market value was this—a statement that simply equated the accepted bid with fair market value: "Fair Market Value: Purchase Price and terms presented represent the Fair Market Value as per Food and Agricultural Code 3884.2(c)."

### 4. *The Litigation*

On November 12—three days before the Department was scheduled to execute the transaction with Facilities Management—a group of individuals and entities filed a petition for writ of mandate seeking to stop the deal in the superior court.

A word on who's who in the litigation: The challengers to the sale—the petitioners in this writ proceeding—are a diverse group of parties, united by an opposition to the sale to Facilities Management. These parties are:

—Advanced Real Estate Services, a possible buyer of the Fairgrounds, one of the disappointed bidders;

—Tel Phil Enterprises, a company that currently operates a swap meet on the Fairgrounds when the fair is not in session, and its affiliated corporation, American Fairs and Festivals, another disappointed bidder, and their owner, Jeffrey Phil;

—The Orange County Fairgrounds Preservation Society;

—State Senator Lou Correa, State Assemblymember Jose Solorio, and then Costa Mesa Councilmember Katrina Foley. Technically, Senator Correa, Assembly Member Solorio, Councilmember Foley, and the Orange County Preservation Society together filed a separate action, which was soon consolidated with the action brought by Advanced Real Estate Services and the other disappointed bidders. Hence our caption mentions two consolidated trial court actions.

The defenders of the sale—real parties in interest in this writ proceeding—are the buyer, Facilities Management, and the Department.

The trial court (Judge Frederick Horn) issued a temporary restraining order on November 17, 2010, precluding any further action on the part of the Department to consummate the sale of the Fairgrounds. The hearing on the preliminary hearing was set for December 15, 2010. In the interim, Facilities Management was allowed to intervene in the case.

At the December 15 hearing, a new trial judge (Judge Michael Brenner, a retired judge sitting on assignment) denied the request for a preliminary injunction, but extended the duration of the restraining order until December 21. That day, the challengers filed this writ proceeding in our court. This court granted the challengers' request for an immediate stay (which has continued to be in effect until further order of this court) preventing the Department from taking any further steps to sell the Fairground, and set an expedited briefing schedule.

## DISCUSSION

Two of the issues raised in the petition for writ of supersedeas are meritorious. Indeed, as noted above, one of those issues necessarily prevents *this* proposed sale to Facilities Management entirely. Whether the Governor will wish to proceed with a new sale is a matter on which we need not speculate.

1. *There Was a Failure to Inform the Legislature of the Fair Market Value of the Property in Comparison to the Bids Received*

The governing statute is section 3884.2. It contains three distinct references to the concept of "fair market value"—one in subdivision (c), one in subdivision (d)(2) which syntactically must be read in conjunction with subdivision (d)(1), and the other in subdivision (d)(3).

Here are those three references:

(1) Section 3884.2, subdivision (c): "The sale of the real property authorized by this section shall be pursuant to a public bidding process designed to obtain the highest, most certain return for the state from a responsible bidder, and *any transaction based on such a bidding process shall be deemed to be the fair market value for the property.*" (Italics added.)

(2) Section 3884.2, subdivision (d)(1) and (2): "Thirty days prior to executing a transaction for a sale of real property authorized by this section, the Director of General Services *shall report* to the chairpersons of the fiscal committees of the Legislature all of the following: [¶] (1) The financial terms

of the transaction. [¶] (2) *A comparison of fair market value* for the real property *and the terms listed in paragraph* (1)." (Italics added.)

(3) Section 3884.2, subdivision (d)(3): "Thirty days prior to executing a transaction for a sale of real property authorized by this section, the Director of General Services *shall report* to the chairpersons of the fiscal committees of the Legislature all of the following: [¶] . . . [¶] (3) Any basis for agreeing to terms and conditions *other than* fair market value." (Italics added.)

The Department, in its letter of October 19 to the chairpersons of the Legislature's fiscal committees, took the position that it was enough to send the terms of the proposed transaction with Facilities Management, because, said the Department, under subdivision (c), those terms were ipso facto the "fair market value."

The Department's October 19 position equating the Facilities Management proposal with ultimate fair market value directly contradicted the Department's previous position in the first round of bidding. In that first round, the Department apparently had its own independent idea of the Fairgrounds's fair market value and thought that the highest bid of $56.5 million did not measure up to that fair market value.

The October 19 letter to the fiscal chairpersons of the Legislature made no reference to section 3884.2, subdivision (d). Said the letter: "Purchase Price and terms presented represent the Fair Market Value as per Food and Agricultural Code 3884.2(c)."

The assumption that the deal *itself* established fair market value as required in the report to the fiscal chairpersons of the Legislature is untenable because it creates an internal contradiction within section 3884.2. Or put another way, the Department's interpretation of fair market value reads section 3884.2, subdivision (d) out of existence and presumes the Legislature was engaging in an idle act.

■ Section 3884.2, subdivision (d)(2) plainly requires that the Department provide its own ascertainment of fair market value to the fiscal chairpersons of the Legislature, so the Legislature, if it so chooses, has at least a little time to derail any deal. And even more strongly, subdivision (d)(3) expressly contemplates the possibility that the "terms and conditions" of the sale of the Fairgrounds *might not* be "fair market value."

There is thus no way the Department's isolated reading of section 3884.2, subdivision (c) can be reconciled with subdivision (d)(3). Under the Department's reading, the statute would be providing for the possibility that

fair market value was both equal to and *not* equal to the proposed terms of the sale. It would make the statute go tilt.

To be sure, for the Department to give the Legislature a comparison of the fair market value of a given property so as to be able to compare it with a proposed sale necessarily entails some sort of *estimate* of fair market value. But then, as every homeowner who ever applied for a loan on his or her house knows, everything short of an actual sale must necessarily be an estimate. Coming to such an estimate is the sort of thing real estate appraisers do all the time, including properties like the Fairgrounds where such an estimate (based on, say, a future income stream or projected resale prices if and when the property is ever developed) can be complex.

We should point out that the three provisions are easily reconciled simply by recognizing they refer to different points in time. Section 3884.2, subdivision (c) speaks from a time *after* the transaction has been consummated; hence it is merely declarative. In subdivision (c), no one actually has to *do* anything. The operative words in subdivision (c) are "based on"—past tense. So, indeed, *after* the "bidding process" required in the first sentence has result*ed* in a "transaction," no one—e.g., a taxpayer challenging the transaction after completion, or a tax assessor—will be able to claim that the Fairgrounds was not sold for fair market value. Such protection would, of course, be reassuring to any *potential* buyer before the transaction—no need to worry about a taxpayer alleging that the buyer got the proverbial "steal."

By contrast, section 3884.2, subdivision (d)(2) and (3) address the point in time when the Department has made a selection which it *proposes* to consummate, but must first give notice to the Legislature.

Timing is key: 30 days *prior* to the Department actually *completing* a *proposed* transaction, members of the Legislature, in a position to initiate legislation to stop the proposed transaction, were to be given a comparison of the transaction with the fair market value of the property.

■ Section 3884.2, subdivisions (b) and (f) confirm our reconciliation of subdivision (c) with subdivision (d), i.e., that the Legislature wanted an estimate of fair market value 30 days before the Department agreed to any transaction. Subdivision (b) puts a three-month limit on any contracts (like a lease) that could affect "the use or operation" of the Fairgrounds, and subdivision (f) requires the Department to "report to the Legislature on or before June 30 of each year on the status of the sale." The implication is that the Legislature contemplated a much more leisurely timeframe than a quick, fire-sale-style disposal of the Fairgrounds—that is, a timeframe in which the Department would have plenty of time to prepare its own estimate of fair market value.

### a. *The administrative deference argument*

The argument based on administrative deference does not work in the case of section 3884.2. (Counsel for the Department at oral argument ended his defense of the sale by asserting the Department acted wholly within its discretion in awarding the sale to Facilities Management.) The language of section 3884.2, subdivision (d) is too plain to excuse noncompliance with section 3884.2 under the cover of administrative discretion. (See *Bonnell v. Medical Board* (2003) 31 Cal.4th 1255, 1265 [8 Cal.Rptr.3d 532, 82 P.3d 740] ["Applying these basic principles of judicial review, our deference is unwarranted here. The Board's interpretation is incorrect in light of the unambiguous language of the statute. We do not accord deference to an interpretation that is ' "clearly erroneous." ' "].)

### b. *The problem of disclosure*

We do understand that the Department might be reluctant to disclose its own, internal, estimate of "fair market value." But we note that section 3884.2, subdivision (d) requires a report to only the *chairpersons* of the fiscal committees, not the entire Legislature—the analog that comes to mind is when only certain members of the "intelligence committees" of Congress are privy to some clandestine operation. Nothing in subdivision (d) or in the rest of section 3884.2 requires the Department to *publicly* disclose its evaluation of the Fairgrounds's fair market value. But it must be disclosed in any event.

### 2. *The Award Here Was Not Pursuant to a Public Bidding Process "Designed" to Obtain the Highest Most Certain Return from a "Responsible" Bidder*

A second reason *this sale* did not comply with section 3884.2 was the absence of *any* bid protest mechanism at all. Without such a mechanism, we cannot say that the "process" by which the Department awarded the sale to Facilities Management was *designed* to obtain the highest and most certain return from a *responsible* bidder.

Preliminarily, the Department's argument that general principles of public contracting law should not apply in this case, because it involves the *sale* of property as distinct from the *procurement* of goods or services, is untenable. The text of section 3884.2 plainly says that the sale of the Fairgrounds will be conducted "pursuant to a public bidding process" and nothing is more concerned with "public bidding" processes than public contracting law.

Interestingly enough, the phrase "public bidding process" appears rather sparsely in the California Codes, and is nowhere specifically defined. An

analog phrase, "competitive bidding process," appears much more frequently in the Codes. It is to be found in such disparate places as the Health and Safety Code (e.g., Health & Saf. Code, § 25395.41, subd. (a) [authorizing solicitation for environmental insurance "through a competitive bidding process"]), the Education Code (e.g., Ed. Code, § 8238.4, subd. (a) [contemplating awarding of early child development funds "under a new competitive bidding process"]), even the Penal Code (Pen. Code, § 13823.93, subd. (b) [establishing a hospital-based training center "through a competitive bidding process"]) as well as—to be expected—the Public Contract Code (e.g., Pub. Contract Code, § 5110, subd. (a) [providing for procedures when a public improvement project is "determined to be invalid due to a defect or defects in the competitive bidding process"]). But, as with its younger sibling "public bidding process," the phrase "competitive bidding process" also does not carry a specific, statutory definition.

For sake of argument let us assume that a "public bidding process," by itself, may not necessarily imply a formal bid protest mechanism. (For example, as might be the case with a cash-only auction.)

■ However, as this court noted in *Great West Contractors, Inc. v. Irvine Unified School Dist.* (2010) 187 Cal.App.4th 1425 [115 Cal.Rptr.3d 378] (*Great West*), the "amount of leeway a public entity has in awarding a contract is governed by the statutory or municipal framework applying to that contract." (*Id.* at p. 1447.) And when we examine those extra words which the Legislature appended to section 3884.2 after the words "public bidding process," the necessity of a formal bid protest system is ineluctable.
■ The public bidding process must be "designed to obtain," the "highest, most certain return," and obtain it "from a responsible bidder." (§ 3884.2, subd. (c).)

Let us begin first the latter phrase, "from a responsible bidder." Responsibility is a well-covered idea in public bidding law (see generally *Great West, supra,* 187 Cal.App.4th at pp. 1450–1452 [discussing nature of responsibility as found in the case law]). In a word, the cornerstone of responsibility in public bidding law is trustworthiness.

■ Responsibility, however, raises the touchy problem of subjective judgment. As explained in *D.H. Williams Construction, Inc. v. Clovis Unified School Dist.* (2007) 146 Cal.App.4th 757, 763–764 [53 Cal.Rptr.3d 345] (also in *Great West, supra,* 187 Cal.App.4th at p. 1456), determinations of responsibility typically involve *subtle administrative judgment,* information received outside the bidding process itself, and, inherently carry at least some danger of arbitrary or erroneous determinations. Accordingly, under well-established California law, the determination that an otherwise winning bidder is "irresponsible" entitles the bidder, as a matter of due process, to a hearing on that

determination. (See *City of Inglewood-L.A. County Civic Center Auth. v. Superior Court* (1972) 7 Cal.3d 861, 867 [103 Cal.Rptr. 689, 500 P.2d 601].)

Now let us consider that phrase, "highest, most certain return" as used in section 3884.2, subdivision (c). We have already noted that the Department evaluated one of the challenger's bids as having a "net present value" of $20 million higher than the winner's bid. Now, we can understand why the Department might have chosen the latter's bid as the more "certain." Even so, much of oral argument before this court in this writ proceeding was taken up with a squabble between rival bidders over precisely whose bid was the "highest." *That* is the sort of issue that is classically handled at the administrative level, but here, the development of any proper record was foreclosed by the absence of any bid protest procedures.

Bid protest systems also help ensure that some bidders do not obtain an unfair advantage over other bidders by submitting materially *nonresponsive* bids. (For a detailed discussion of the difference between nonresponsibility and nonresponsiveness, see *Great West, supra*, 187 Cal.App.4th at pp. 1450–1454.) Again, oral argument in this case provides a good example of how bid protest procedures can resolve—or at least provide a proper record for the later resolution of—potential problems of nonresponsiveness at the administrative level.

Here, the challengers claim that Facilities Management's bid did not, as was required under the second request for proposals, provide financial information for each of its principals. The theory appears to be that, by not disclosing some of its investors, Facilities Management was able to propose an apparently better deal than its rivals who did disclose their investors.

Now, we need not decide the merits of the challengers' claim about the nonresponsiveness of Facilities Management's bid to know that it makes a valid point about *the process*. If some sort of bid protest system had been in place, the merits of the challengers' assertion that Facilities Management had submitted a materially nonresponsive bid would have been considered at the administrative level. (There are, of course, a number of cases on the subject of when public entities may *excuse* facially nonresponsive bids. (See *Great West, supra*, 187 Cal.App.4th at p. 1454, fn. 24.).)

We stress that we do not here deal with the merits of any claims that Facilities Management's bid was materially nonresponsive. Our point is that there was no opportunity at all to present such a claim administratively, and there should have been.

■ A recent opinion that is instructive on the need for procedures to ensure that a bidding process is not only honest, but *seen to be honest*, is

*Schram Construction, Inc. v. Regents of University of California* (2010) 187 Cal.App.4th 1040 [114 Cal.Rptr.3d 680] (*Schram Construction*). Although not a section 3884.2 case, the salient point of *Schram Construction* is that there must be "affirmative safeguards in place to prevent bias and other arbitrary factors from influencing the bid selection" (187 Cal.App.4th at p. 1059), lest—in the language of section 3884.2—the "integrity of the public bidding process" be undermined. (187 Cal.App.4th at p. 1059.)

The *Schram Construction* court had occasion to consider a Public Contract Code statute (§ 10506.4, subd. (c)) requiring the University of California (University) to adopt procedures ensuring bid selections were "conducted in a fair and impartial manner." But the university had adopted a selection procedure for certain work on a new medical center that allowed it to pick and choose among alternative bid packages. (*Schram Construction, supra*, 187 Cal.App.4th at p. 1053.) Specifically, since the medical center was to consist of more than one building, and since the contract was for mechanical, electrical and plumbing work, there were many combinations of possible "bid packages" which the University put out for bidding. One "bid package," for example, consisted of just the plumbing work on one building, while an alternative bid package consisted not only of the plumbing work, but of the heating and air conditioning work on that building as well. (See *id.* at pp. 1045–1046.) By structuring the selection process to give the University the option of looking at bids involving only certain combinations of work— because not every bidder actually bid on every bid package—the net result was that the University's selection committee was in a position to manipulate the "public bidding process." (*Id.* at p. 1059.)

Recognizing that there was no evidence of favoritism, the *Schram Construction* court nevertheless concluded that even the mere *ability* to manipulate the process contravened the statute, if only by creating an "appearance of favoritism." Said *Schram Construction*: "In requiring the University to adopt procedures that 'ensure' that the selection will be impartial, section 10506.4, subdivision (c) suggests it is not enough to simply refrain from favoritism; *the University must put affirmative safeguards in place to prevent bias and other arbitrary factors from influencing the bid selection.* We also conclude that the University's procedure here created *an appearance of favoritism and undermined the integrity of the public bidding process*, particularly since [the general contractor] had done a substantial amount of work with" the only bidders who had put bids on the particular bid package which was ultimately selected. (*Schram Construction, supra*, 187 Cal.App.4th at p. 1059.) The net result was to direct the trial court to enter an order setting aside the winner's subcontract. (*Id.* at p. 1062.)

The overarching idea behind bid protest systems is, of course, to keep the public bidding process free of favoritism. As one essay on public contract

law states: "Overall, the bid protest process is a critical tool in ensuring public contracting is done in a fair and reasonable manner, as the agency has to keep in mind that contractors are keeping a close eye on the process and will not tolerate behavior that does not ensure all bidders are treated fairly and in strict accordance with the rules that apply to each specific acquisition." (Kinberg, *Successful Strategies in Defense Contract Bid Protests* in Government Contract Bid Protests: Leading Lawyers on Conducting Preliminary Research, Navigating the Negotiation Process, and Identifying Key Players (2009 ed.) 2009 WL 533079, p. *11; see also Day, *The Bid Protest Jurisdiction of the United States Claims Court: A Proposal for Resolving Ambiguities* (1984–1985) 15 Pub. Cont. L.J. 325, 331–332 [noting allowance for bid protests arises from the idea that " 'the invitation for bids will be fully and fairly considered.' "].)

Indeed, bid protest systems are considered so important for honest processes that they have been hardwired into, of all things, the NAFTA Treaty. (NAFTA Treaty (Dec. 17, 1992) 32 I.L.M. 289 & OS (1993) art. 1017 ["In order to promote fair, open and impartial procurement procedures, each Party shall adopt and maintain bid challenge procedures for procurement covered by this Chapter in accordance with the following: [¶] (a) each Party shall allow suppliers to submit bid challenges concerning any aspect of the procurement process, which for the purposes of this Article begins after an entity has decided on its procurement requirement and continues through the contract award . . . ."]; see Appleton, NAFTA: Legal Text and Interpretive Materials (2007 ed.) ch. 10, § 13: ["In order to promote fair and open procurement procedures, Article 1017 requires each government to maintain a 'bid challenge' mechanism enabling individual suppliers to have the entire bidding process reviewed. Suppliers from other NAFTA countries will have the right to challenge both bid procedures and contract awards, and will be assured that an independent body in each country will review such challenges and recommend action to correct any discrepancies."]; Folsom, International Business Transactions (2010) ch. 21 ["Independent bid challenge mechanisms must be created by each member state and transparency in the bidding process promoted by timely release of information."].)

For its part, the California Legislature has, in an uncodified preamble to a statute providing for the procurement of information technology, also recognized the value of a bid protest mechanism: "The Legislature finds and declares the following: [¶] . . . [¶] (b) The integrity of the procurement process, as well as the ability to attract maximum competition, are further enhanced by allowing an aggrieved bidder the right to a timely and equitable process to protest a solicitation, award, or related decision." (Stats. 1995, ch. 932, § 1, p. 7080.)

And, of course, we know the Department is very familiar with bid protests, having developed an administrative manual that provides for them in the course of procurement of information technology. (See Pub. Contract Code, § 12102, subd. (h); *United Systems of Arkansas, Inc. v. Stamison* (1998) 63 Cal.App.4th 1001, 1008–1009 [74 Cal.Rptr.2d 407] (*United Systems*) [noting that § 5210.2 of State Administrative Manual establishes a formal bid protest system]; see also *Imagistics Internat., Inc. v. Department of General Services* (2007) 150 Cal.App.4th 581 [59 Cal.Rptr.3d 18] [necessity of strict compliance with bid protest procedures, and necessity of exhausting bid protest procedure as administrative remedy on part of unsuccessful bidder]; *MCM Construction, Inc. v. City and County of San Francisco* (1998) 66 Cal.App.4th 359 [78 Cal.Rptr.2d 44] [bid protest procedures are an administrative remedy that must be exhausted].) Indeed, the failure to give a losing bidder timely notice of an intent to award a contract to a rival bidder so it could have its bid protest considered was held remediable in *United Systems*. (See *United Systems, supra,* 63 Cal.App.4th at pp. 1011–1012 [losing bidder entitled to have its bid protest considered].) The absence in this particular case was inconsistent with the governing statute.

## DISPOSITION AND CONCLUSION

Perhaps it might be possible, even at this late date, for the Department to allow for bid protests. We do not decide that. But it is impossible, in any event, to undo the error of not giving the Legislature its statutorily reserved opportunity to have a comparison between the deal the Department proposed to make, and the property's fair market value so that the Legislature would have the chance to veto the deal. *This* sale contravened the statute, and therefore cannot be consummated. Any future sale must begin again at square one.

We also recognize there is a challenge based on the California Constitution. However, given that the sale to Facilities Management as "processed" by the Department cannot be consummated consistent with section 3884.2, we will follow *Epstein v. Superior Court* (2011) 193 Cal.App.4th 1405 [122 Cal.Rptr.3d 850] (absence of buyer in litigation over sale of state office buildings prompted appellate court not to address propriety of sale where incoming governor had terminated sale) and leave these questions for another day.

In procedural terms, it was error to terminate the temporary restraining order preventing the completion of the sale, and, accordingly, also error not to grant the preliminary injunction. Therefore the writ of supersedeas—which is the procedural means by which the proposed sale is to be prevented pending the (now inevitable) final judgment granting a writ of mandate to undo the

sale—must be granted. Therefore, let a writ of supersedeas issue directing the trial court to enter an order preventing the Department from taking any further steps to sell the Fairgrounds.

The stay issued by this court preventing any further action to conclude the Fairgrounds sale will remain in force until further order of this or the California Supreme Court, or until the writ of supersedeas is in full effect.

O'Leary, J., and Moore, J., concurred.

A petition for a rehearing was denied July 5, 2011.